[Civ. No. 19456. Third Dist. May 13, 1981.]

TOR KRIEGER, Plaintiff, Cross-defendant and Appellant, v. PACIFIC GAS AND ELECTRIC COMPANY, Defendant, Cross-complainant and Respondent.

COUNSEL

Kronick, Moskovitz, Tiedemann & Girard, Stephen A. Kronick and Adolph Moskovitz for Plaintiff, Cross-defendant and Appellant.

Charles T. Van Deusen, Edward J. McGanney, Pamela Chappelle, James C. Logsdon, Robert L. Bordon and Charles E. Corker for Defendant, Cross-complainant and Respondent.

OPINION

CARR, J.—Appellant Krieger appeals from a judgment entered on his complaint denying him damages and a permanent injunction to prevent respondent Pacific Gas & Electric Company (PGandE) from lining a section of its Upper Utica "Canal" with a concrete-like substance known as "gunite." PGandE also cross-complained for damages and injunctive relief to prevent Krieger from appropriating water from the ditch in question for his own use. Krieger likewise appeals from the judgment on the cross-complaint assessing $100 compensatory and $100 punitive damages for water wrongfully appropriated by Krieger.

The essential controversey herein is whether respondent's easement rights to an earthen water ditch traversing appellant's land encompasses the right to line the earthen ditch with the concrete-like gunite.

The facts disclose that in 1973, Krieger purchased approximately 16.5 acres of forested land near Highway 4 between McKay's Point diversion dam and Hunter's Point Reservoir in Calaveras County.

In 1946, PGandE purchased from the Utica Power Company the Upper Utica ditch [1] which traverses appellant's land. Water is transported via the ditch from the Stanislaus River to respondent's Hunter's Point Reservoir. The easement for the man-made ditch exists by virtue of a July 26, 1866, act of Congress (43 U.S.C.A. § 661.)[2]

From its inception and at the time Krieger's property was patented in 1914, the ditch was open and earthen.

Several years ago PGandE began lining the Upper Utica ditch with gunite, in an effort to prevent leakage and to curtail saturation of the ditch bank or berm. Guniting proceeded on a piecemeal basis as needed. By the time appellant acquired his property in 1973, approximately one-third of the stretch crossing his property had been gunited, leaving approximately 1,000 feet in its original, earthen condition. Upon acquisition, Krieger made it known to PGandE he would oppose any further attempts to gunite the remaining portion.

---

[1]Respondent refers to the ditch as a "canal."

[2]The act of Congress of 1866 recognized the right to construct ditches for transporting water across the public domain. The act protected water and ditch rights which had vested at the time of its passage and protected such rights against subsequent private owners. (See 52 Cal.Jur.2d, Waters, § 636, pp. 257-258.)

In April 1976 the parties met, accompanied by respective counsel, and agreed to seek alternative methods to limit permeation. The parties also agreed Krieger would be notified before further guniting. The alternatives included: (1) the installation of wooden side-lining; and (2) a process by which the downslope side of the ditch was dug and filled with bentonite, an expandable clay-type material. The temporary success of the bentonite method, which required constant maintenance, was unacceptable to PGandE. In the fall of 1978, PGandE attempted to notify Krieger by mail of its intent to commence guniting. The notice was returned as Krieger had moved from the last address known to PGandE.

When Krieger's new address was found in the San Francisco telephone directory, the letter was remailed. Guniting had already commenced when Krieger finally received the notice. Between November 6 and 9, PGandE gunited two-thirds to three-fourths of one side of the stretch, one-half of the other side and one-fourth to one-third of the bottom. On November 9, the day after receiving notice, Krieger filed his complaint in this action,[3] and obtained a temporary restraining order pending judicial resolution; he subsequently amended his complaint requesting that PGandE be required to remove the gunite which had been installed between the 6th and 9th of November, and to restore the affected stretch of the ditch to its prior earthen condition.

On or about December 15, 1978, PGandE filed a cross-complaint seeking damages for appellant's alleged appropriation of water from the ditch. Trial was by the court.

The trial court concluded as a matter of law: 1) "the repair of the Upper Utica Canal by guniting is, as it was in November 1978, within the scope of the easement owned by PGandE;" and "guniting is... within the scope of PGandE's secondary easement of repair, [and] does not alter its mode of operation and does not increase the burden to such land.

However, in the findings of fact, the court found: "PGandE owns a water ditch easement ... which traverses Krieger's land. The easement

---

[3]The complaint alleged trespass and sought a temporary restraining order, preliminary injunction, permanent injunction, and damages.

exists by virtue of the act of July 26, 1866 (43 U.S.C.A. § 661),[4] and 2) At the time the Krieger property was patented . . . the entire stretch of the Ditch crossing Krieger's land was open and earthen."

■ We conclude, based on the trial court's findings of fact, the court erred as a matter of law in ruling that guniting the earthen ditch does not exceed the scope of respondent's easement rights and is within the scope of the secondary easement of repair. We consider each of the two related issues separately.

■ The act of July 26, 1866 (43 U.S.C.A. § 661) has been consistently construed as conferring upon appropriators of waters on public lands easements for their ditches when the public lands through which the ditches ran passed into private ownership. (See *Broder v. Natoma W. & M. Co.* (1875) 50 Cal. 621, 623, affd. *Broder v. Natoma Water and Mining Company* (1879) 101 U.S. 274 [25 L.Ed. 790]; *Smith v. Hawkins* (1895) 110 Cal. 122, 125 [42 P. 453]; *Felsenthal v. Warring* (1919) 40 Cal.App. 119 [180 P. 67].)

The California courts have consistently held the scope of the easement to be fixed by the location, character and use in existence at the time the land became subject to the easement, which, in the instant case, is the time the property was patented. (*Vestal v. Young* (1905) 147 Cal. 715, 717, 719 [82 P. 381]; *Oliver v. Agasse* (1901) 132 Cal. 297, 300 [64 P. 401]; *Felsenthal v. Warring, supra,* 40 Cal.App. at pp. 126-127; *Smith v. Rock Creek Water Corporation* (1949) 93 Cal. App.2d 49, 52 [208 P.2d 705].)

Civil Code, section 806 provides: "The extent of a servitude is determined by the terms of the grant, or the nature of the enjoyment by which it was acquired." In *Felsenthal v. Warring, supra,* 40 Cal.App. at

---

[4]The act at all relevant times herein provided: "Whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; and the right of way for the construction of ditches and canals for the purposes herein specified is acknowledged and confirmed; but whenever any person, in the construction of any ditch or canal, injures or damages the possession of any settler on the public domain, the party committing such injury or damage shall be liable to the party injured for such injury or damage. [¶] All patents granted or preemption or homesteads allowed, shall be subject to any vested and accrued water rights, or rights to ditches and reservoirs used in connection with such water rights, as may have been acquired under, or recognized by this section." (§ 661 was amended in 1976; Pub.L. No. 94-579, 90 Stat. 2793.)

pages 126-127, wherein the owner of a water-ditch easement sought to reconstruct the ditch along a new line (25 to 40 feet west of the old line) the court in discussing section 806 with respect to the act of July 26, 1866, stated: "Whether respondents' title to a right of way for a ditch be regarded as one resting upon an express grant from the government under the act of July 26, 1866, ... or upon prescription—an implied grant—the result is the same. If regarded as an express grant from the government, it was a grant that did not specifically bound or define the right of way. While the land was still a part of the public domain, the way became definitely fixed and located along a certain line by the conduct of the grantees, the respondents here [citation]; and when appellant's land acquired the impress of private property, the terms of the grant could not be changed, without his consent, so as to change the character of the easement or materially increase the burden of the servient estate. [Citation.] ... The nature of respondents' enjoyment of the servitude consisted in conducting water in an open earthen ditch that followed a certain well-defined and established course over appellant's land—a line that had been established for many years. That line, therefore, and none other, fixed the extent of the servitude that rested upon appellant's realty."

When Krieger's land was patented, the character and method of use of the easement was an open, earthen ditch for the conveyance of water. This character and method of use fixed the extent of the servitude on Krieger's property under the law. Once fixed, the scope of the easement cannot be changed without the consent of the servient owner.

"When patents are issued by the United States for public lands, the patentees take title subject to any easement then existing, but the owner of a ditch right across the patented lands is without power or right to increase the burden of the easement thereafter, or to change the mode of its enjoyment without consent of the patentees or their successors in interest." (52 Cal.Jur.2d, Waters, § 661, p. 288; citing *Smith* v. *Rock Creek Water Corp.* (1949) 93 Cal.App.2d 49, 52 [208 P.2d 705].) "... both parties have the right to insist that so long as the easement is enjoyed it shall remain substantially the same as it was at the time the right accrued, entirely regardless of the question as to the relative benefit and damage that would ensue to the parties by reason of a change in the mode and manner of its enjoyment." (*Allen* v. *San Jose Land & Water Co.* (1891) 92 Cal. 138, 141 [28 P. 215].)

The rationale for these restrictive and long-relied upon rules of property law is explained in *Felsenthal* v. *Warring, supra,* 40 Cal.App. 119, at page 131: "We know of no principle of law or power in a court of equity to justify or authorize an invasion of the property rights of one private party to serve the convenience or necessities of another private party. Such a principle, if once adopted by judicial tribunals, upon grounds of necessity, would, in its practical operation, result in a system of judicial condemnation of the property of one citizen to answer an assumed necessity or convenience of another citizen, and the sacred right of property, so jealously guarded by courts in all English-speaking countries, would become but a shadowy unsubstantiality.

In both *Allen* v. *San Jose Land & Water Co., supra,* 92 Cal. at page 142, and *Oliver* v. *Agasse, supra,* 132 Cal. 297 [64 P. 401], the Supreme Court held an easement to conduct water in an open earthen ditch was substantially altered by placing a covered pipeline in the ground in lieu thereof. By analogy, the principle of those cases applies here. We perceive no significant differences between an impervious concrete lining and a pipeline. The former is merely a three-sided pipe instead of a four-sided one. The aim and result of each is essentially the same, to change the character of an earthen ditch subject to percolation of water to one which is impervious.

■ Respondent contends the guniting of the ditch falls within the ambit of its "secondary easement" to make necessary repairs. ■ In *Smith* v. *Rock Creek Water Corp., supra,* 93 Cal.App.2d at page 53, the court stated: "The secondary easement is no more than the right to make repairs and to do such things as are necessary to the exercise of the right and to do them only when necessary and in such reasonable manner as not to increase the burden needlessly on the servient estate or to enlarge it by alteration in the mode of operation.

■ The guniting of the earthen ditch enlarges the easement by alteration in the mode of operation and is not merely a repair. "The word 'repair' in its ordinary sense relates to the preservation of property in its original condition, and does not carry the connotation that a new thing should be made or a distinct entity created." (*Whalen* v. *Ruiz* (1953) 40 Cal.2d 294, 300 [253 P.2d 457].) The easement owner "may make repairs, improvements, or changes that do not affect its substance." (*Burris* v. *People's Ditch Co.* (1894) 104 Cal. 248, 252 [37 P. 922]; *Brown* v. *Ratliff* (1913) 21 Cal.App. 282 [131 P. 769]; *White* v. *Walsh*

(1951) 105 Cal.App.2d 828 [234 P.2d 276].) Here the "repair" affects the substance of the easement.

The trial court found that "[g]uniting the earthen stretch of the ditch crossing Krieger's land does not increase the burden to such land" and stated in its intended decision that "there would be no detriment to Krieger's property which can be legally recognized." But the court also found that the riparian vegetation which flourishes in the soil moistened by water percolating through the earthen walls of the ditch would recede and eventually be supplanted by otherwise indigeneous vegetation. Presumably, the riparian vegetation has flourished throughout the 120-year history of the earthen water ditch, and is enjoyed by appellant as a benefit of the easement. "Burden" and "benefit" may be understood as two aspects of one concept such that a decrease in benefit achieves a corresponding increase in burden. Thus the court's finding that guniting does not increase the burden to appellant's land is inconsistent with the finding that environmental riparian vegetation would be lost.

PGandE argues, and the trial court agreed, that because Krieger cannot acquire a vested right to seepage he cannot claim a detriment from guniting. PGandE's reliance on *Stevens v. Oakdale Irr. Dist.* (1939) 13 Cal.2d 343 at page 350 [90 P.2d 58], is misplaced. Under the rule of *Stevens, supra,* Krieger, as an appropriator of seepage, "merely secures the corpus of the water thus escaping as personalty" but cannot prevent PGandE from ceasing to convey water via the ditch. PGandE is free to abandon the easement, thereby extinguishing it. However, so long as the easement burdens Krieger's land, he is entitled to the benefit running therewith. Accordingly, the court's finding of no detriment is unsupported by the evidence, and its determination that there would be no detriment legally recognizable is erroneous.

PGandE urges we adopt the reasoning of the Utah Supreme Court in *Big Cottonwood Tanner Ditch Co. v. Moyle* (1946) 109 Utah 213 [174 P.2d 148], a case factually similar to the case at bench. In that case, the court emphasized the historically arid conditions existing in Utah and explained, "[T]he common law of Utah presumes that during the time of the creation of this easement all parties concerned knowing the arid nature of this country, contemplated that at some future time the owner of the water would ... undertake to prevent waste as the need arose for more efficient use of the limited water available." (*Id.* at p. 231.) Accordingly the Utah court determined, "[P]laintiff's easement

includes the right to [cement] the ditches in the interests of water conservation . . . ." (*Id.* at p. 233.) The court specifically distinguished the California case of *Allen* v. *San Jose Land & Water Co., supra,* 92 Cal. 138, noting: "Those cases decided in states where the need for water conservation does not exist or exists only to a limited degree are not controlling here as the common law of these states in reference to easements to course irrigation water is different from that of this state." (*Id.* at p. 235.)

PGandE asserts the applicability of the Utah rationale in light of the water conservation policy expressed in article X, section 2, of the California Constitution which provides, inter alia: "It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare.

In this case we find no substantial evidence to support the premise that "waste" results from the absence of a gunite lining of the remaining earthen portion of the ditch. The evidence is that water seepage through the permeable, earthen portion of the ditch supports riparian vegetation not otherwise indigenous. One might reasonably conclude the seepage is beneficial within the intendment of article X, section 2. Respondent, if it desires to compensate Krieger, may achieve its objective of guniting the ditch by exercising its right of eminent domain.[5] Thus, even assuming arguendo, the earthen nature of the ditch causes "waste" within the meaning of article X, section 2, such "waste" could be prevented without PGandE exceeding the scope of its easement rights.

■ The trial court found that "[i]n November 1978 and again in the spring of 1979 Tor Krieger was discovered stealing water, by the use of siphons, from the Upper Utica Canal;" that "$100 is reasonable compensation [therefor]; and that an additional $100 in punitive damages is sufficient to discourage Tor Krieger from further appropriations . . . ."

---

[5]Eminent domain (Cal. Const., art. I, § 19) is available to respondent pursuant to sections 610 and 618 of the Public Utilities Code. (See e.g. *St. Helena Water Co.* v. *Forbes* (1882) 62 Cal. 182; *Walker* v. *Shasta Power Co.* (9th Cir. 1908) 160 F. 856.)

Appellant contends, and we agree, there is no substantial evidence PGandE suffered damages in the sum of $100. Krieger's testimony provides the only direct evidence on the issue of the amount of water appropriated. Krieger testified he spent a maximum of four months at his property in 1977 and 1978; it was during that period he appropriated Upper Utica water through a siphon hose, through which water flowed only when needed, a maximum of 100 gallons per day (gpd).

The supervisor of PGandE's water department testified the rate of flow through such a hose would be 18 gallons per minute (gpm) and based on that flow rate, respondent's dollar loss would be $1.08 per day. Simple calculations reveal, on the basis of 100 gpd for a period of 120 days, the value of the siphoned water is approximately 50 cents.[6] Hence, the award of $100 compensatory damages was excessive. (Civ. Code, § 3336.)

█ Claimed error in awarding exemplary damages is based on a lack of showing of "malice" within the meaning of Civil Code section 3294.[7] Causes of action for conversion and trespass support an award for exemplary damages. (*Cyrus* v. *Haveson* (1976) 65 Cal.App.3d 306, 316 [135 Cal.Rptr. 246].) For purposes of section 3294, "malice" has been defined as the motive and willingness to vex, harass, annoy or injure. (*Beck* v. *State Farm Mut. Auto. Ins. Co.* (1976) 54 Cal.App.3d 347 [126 Cal.Rptr. 602]; *Haun* v. *Hyman* (1963) 223 Cal.App.2d 615, 620 [36 Cal.Rptr. 84].) █ "Where a trespass is committed from wanton or malicious motives, or a reckless disregard of the rights of others, or under circumstances of great hardship or oppression, it is clear that punitive damages may be awarded." (*Haun* v. *Hyman, supra,* 223 Cal.App.2d at p. 620.) "Oppression for which punitive damages may be awarded 'means subjecting a person to *cruel* and *unjust* hardship in conscious disregard of his rights.' (Italics added.) (*Richardson* v. *Employers Liab. Assur. Corp.* (1972) 25 Cal.App.3d 232, 246 [102 Cal.Rptr. 547].)" (*Farmy* v. *College Housing, Inc.* (1975) 48 Cal.App. 3d 166, 176 [121 Cal.Rptr. 658].)

---

[6]The value of lost water for 120 days is calculated as follows:
1) 18 gpm = 25,920 gpd;
2) $\dfrac{X}{100} = \dfrac{\$1.08}{25,920};$
3) X = .00416;
4) $.00416 × 120 (days) = $.4992.

[7]Section 3294 of the Civil Code provides: "In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression,

■ PGandE admits that "there was no direct testimony on the issue, [however] there was certainly abundant circumstantial evidence from which the trial court could conclude that [appellant] acted in conscious disregard of PGandE's rights.

On reviewing the record we find the evidence is insufficient to permit an inference of malice or oppression. In light of the general disfavor with which the law regards exemplary damages (*Beck* v. *State Farm Mut. Auto. Ins. Co., supra*, 54 Cal.App.3d at p. 355), we conclude the trial court erred in awarding exemplary damages.

■ The trial court issued a permanent injunction "to perpetually restrain [appellant], and those acting in his behalf, from making any appropriations of water from the Upper Utica Canal." The water flowing in the ditch is the property of PGandE, and appellant has no right to that water; however, water which percolates, leaks, or seeps through the ditch to appellant's property thereby becomes his property. (*Stevens* v. *Oakdale Irr. Dist., supra*, 13 Cal.2d at p. 350.) Accordingly, the injunction is appropriate.

The order enjoining Tor Krieger from appropriating water directly from the Upper Utica Canal is affirmed. The judgment is otherwise reversed and the cause remanded for further proceedings consistent with this opinion. Each party shall bear respective costs on appeal.

Puglia, P. J., and Reynoso, J., concurred.

A petition for a rehearing was denied June 9, 1981, and respondent's petition for a hearing by the Supreme Court was denied July 10, 1981. Tobriner, J., did not participate therein. Taylor, J.,* participated therein. Mosk, J., was of the opinion that the petition should be granted.

---

fraud, or malice, express or implied, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant.
    *Assigned by the chairperson of the Judicial Council.