[No. C059873. Third Dist. Oct. 15, 2010.]

WILLIAM R. SARALE et al., Plaintiffs and Appellants, v.
PACIFIC GAS AND ELECTRIC COMPANY, Defendant and Respondent.

[No. C060515. Third Dist. Oct. 15, 2010.]

RICHARD G. WILBUR, as Trustee, etc., Plaintiff and Appellant, v.
PACIFIC GAS AND ELECTRIC COMPANY, Defendant and Respondent.

228

COUNSEL

Geiger, Coon & Keen and Charles E. Keen for Plaintiffs and Appellants William R. Sarale et al.

Jones & Dyer, Gregory F. Dyer and Kristen K. Preston for Plaintiff and Appellant Richard G. Wilbur.

Cassel Malm Fagundes, P. Gary Cassel; Sedgwick, Detert, Moran & Arnold, Frederick D. Baker, Gayle L. Gough and Kelly J. Savage for Defendant and Respondent.

Frank R. Lindh, Helen W. Yee and Pamela Nataloni for Public Utilities Commission as Amicus Curiae upon request of the Court of Appeal.

OPINION

**SIMS, J.**—These consolidated appeals involve claims by plaintiff landowners that Pacific Gas and Electric Company (PG&E) engaged in excessive trimming of commercially productive walnut trees located under the utility's power lines. The first appeal is taken by plaintiffs William R. Sarale and Julie Ann Sarale from a judgment of dismissal entered by the San Joaquin Superior Court. The second appeal is taken by plaintiff Richard G. Wilbur, as a trustee, from a judgment of dismissal entered by the Yuba County Superior Court.

The trial courts in both cases sustained PG&E's demurrers without leave to amend and dismissed the complaints pursuant to Public Utilities Code section 1759.[1] Section 1759 bars actions in superior court that will hinder or interfere with the exercise of regulatory authority by California's Public Utilities Commission (the commission). (*San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 918 & fn. 20 [55 Cal.Rptr.2d 724, 920 P.2d 669] (*Covalt*).)

On appeal, the Sarales contend the trial court erred by failing to (1) adjudicate their claims under section 2106,[2] (2) determine whether the easement

---

[1] Undesignated statutory references are to the Public Utilities Code.

Subdivision (a) of section 1759 provides: "No court of this state, except the Supreme Court and the court of appeal, to the extent specified in this article, shall have jurisdiction to review, reverse, correct, or annul any order or decision of the commission or to suspend or delay the execution or operation thereof, or to enjoin, restrain, or interfere with the commission in the performance of its official duties, as provided by law and the rules of court."

[2] Section 2106 provides in pertinent part: "Any public utility which does, causes to be done, or permits any act, matter, or thing prohibited or declared unlawful, or which omits to do any

PG&E claims actually exists under Code of Civil Procedure section 1060,[3] and (3) consider their claim for interference with their property rights under Civil Code section 52.1.[4]

Wilbur contends the trial court erred in dismissing his case when the court had jurisdiction to adjudicate his claim that PG&E engaged in unreasonable tree trimming practices.

We shall conclude that the superior court has jurisdiction to determine whether a utility has a power line easement over a particular property. However, trial courts lack jurisdiction to adjudicate claims that a power utility has engaged in excessive trimming or unreasonable vegetation management when the utility has acted under guidelines or rules set forth by the commission. Section 1759 safeguards the commission's ability to implement statewide safety protocols from being undermined by an unworkable patchwork of conflicting determinations regarding what constitutes necessary or proper management of power lines. In short, challenges to PG&E's tree trimming as unreasonable, unnecessary, or excessive lie within the exclusive jurisdiction of the commission to decide.

Although the Sarales seek a judicial determination with respect to whether PG&E has an easement at all, this claim is defeated by the Sarales' own first amended complaint, which pleaded and attached a right-of-way in favor of PG&E.

act, matter, or thing required to be done, either by the Constitution, any law of this State, or any order or decision of the commission, shall be liable to the persons or corporations affected thereby for all loss, damages, or injury caused thereby or resulting therefrom. . . . An action to recover for such loss, damage, or injury may be brought in any court of competent jurisdiction by any corporation or person."

[3] Code of Civil Procedure section 1060 provides in pertinent part: "Any person interested under a written instrument, excluding a will or a trust, or under a contract, or who desires a declaration of his or her rights or duties with respect to another, or in respect to, in, over or upon property, or with respect to the location of the natural channel of a watercourse, may, in cases of actual controversy relating to the legal rights and duties of the respective parties, bring an original action or cross-complaint in the superior court for a declaration of his or her rights and duties in the premises, including a determination of any question of construction or validity arising under the instrument or contract. He or she may ask for a declaration of rights or duties, either alone or with other relief; and the court may make a binding declaration of these rights or duties, whether or not further relief is or could be claimed at the time."

[4] Civil Code section 52.1, subdivision (b), provides: "Any individual whose exercise or enjoyment of rights secured by the Constitution or laws of the United States, or of rights secured by the Constitution or laws of this state, has been interfered with, or attempted to be interfered with, . . . may institute and prosecute in his or her own name and on his or her own behalf a civil action for damages, including, but not limited to, damages under Section 52, injunctive relief, and other appropriate equitable relief to protect the peaceable exercise or enjoyment of the right or rights secured."

Accordingly, we shall affirm the judgments of dismissal in the Sarales' and Wilbur's cases.

## FACTUAL AND PROCEDURAL BACKGROUND

### *The Sarale Case*

We take the following facts from the Sarales' first amended complaint. (See *White v. State of California* (2001) 88 Cal.App.4th 298, 304 [105 Cal.Rptr.2d 714] [on review of dismissal after sustaining of demurrer, we "assume the truth of all facts properly pled and the truth of facts that may be implied or inferred from these allegations"].)

The Sarales own land on East Eight Mile Road in Linden. PG&E claims an easement across the Sarales' land for electric transmission lines pursuant to a written grant of right-of-way dating from 1915. The right-of-way gives PG&E "the right of erecting, constructing, reconstructing, replacing, repairing, maintaining and using for the transmission and distribution of electricity, a single line of towers and wires suspended thereon and supported thereby, and wires for telephone and telegraph purposes, and all necessary and proper . . . appliances and fixtures for use in connection therewith, and also a right of way along the same of a uniform width of 25 feet . . . , together with the right of ingress thereto and egress therefrom . . . ." The right-of-way further gives PG&E "full right and liberty of cutting and clearing away all trees and brush on either side of said center line whenever necessary or proper for the convenient use and enjoyment of the said line of towers and wires and right of way . . . ."

Until November 2004, PG&E periodically trimmed the Sarales' walnut trees beneath the transmission lines approximately 10 feet away from the lines. After November 2004, however, over the Sarales' protest, PG&E began trimming the walnut trees up to 20 feet away from the lines, "thereby physically destroying large portions of and rendering unproductive what had been producing trees."

In March 2005, the Sarales filed a claim for damages with PG&E. In its August 2005 denial, PG&E asserted it was "legally mandated to take appropriate measures to maintain vegetation clearances and, accordingly, we have trimmed and continue to trim all trees that may interfere with our electric power lines—pursuant to both our rights under our easement/right of way as well as the rules and regulations under which we are required to operate."

In October 2007, the Sarales sued PG&E for damages and declaratory and injunctive relief. The Sarales denied the existence of the utility easement on

their land. Alternatively, if the easement were found to exist, they sought a declaration that PG&E was "authorized by law to trim no further than the distance established by the [commission], radially measured at time of trimming, and not further, without [the Sarales'] permission," as well as a declaration that "the scope of . . . any easement existing" was defined by PG&E's "use of the claimed easement . . . throughout the eighty-nine years prior . . . in which trimming was performed in accordance with the 10 foot safety limit prescribed by law." They sought an injunction preventing PG&E from "destroying vegetation or trimming crops under cultivation . . . to the extent that such activity exceeds acts authorized, regulated or controlled within the exclusive jurisdiction of the [commission]." They also sought damages for trespass and deprivation of their civil rights, as well as statutory civil penalties and attorney fees.

PG&E demurred to the first amended complaint, contending (among other things) that section 1759 barred the court from exercising jurisdiction over the Sarales' claims because to do so would interfere with "an ongoing supervisory or regulatory program over which the [commission] has sole jurisdiction." The utility also filed a motion to strike various portions of the first amended complaint dealing with the trespass cause of action, the prayer for treble damages, and the prayer for a "prior restraint" on PG&E's speech relating to tree trimming regulations.[5]

The trial court sustained the demurrer without leave to amend. The court reasoned: "The acts alleged by [the Sarales] herein, involving and related to . . . PG&E's vegetation management practices under and around its power lines, fall within the [commission]'s regulatory jurisdiction. This court therefore has no jurisdiction over [the Sarales'] first amended complaint for damages and declaratory and injunctive relief and is preempted from issuing any rulings thereon. Before proceeding against PG&E in superior court . . . [the Sarales] must first seek a finding from the [commission] that PG&E's vegetation management practices are excessive or otherwise out of conformance with [commission] regulations. If the [commission] found in [the Sarales'] favor on these matters, [the Sarales] might then seek damages before [the superior court] for the wrongs they allege."

Despite sustaining the demurrer without leave to amend, the trial court also purported to grant PG&E's motion to strike various portions of the complaint.

The Sarales filed a timely notice of appeal from the judgment of dismissal.

---

[5] The Sarales later voluntarily dismissed that portion of their injunctive relief cause of action relating to the prayer for a "prior restraint" on PG&E's speech relating to tree trimming regulations.

*The Wilbur Case*

We take the following facts from Wilbur's first amended complaint.

Wilbur is the owner of property on Speckert Road in Yuba County that has been in his family since 1957. In 1908, by virtue of a written grant of right-of-way, PG&E's predecessor in interest acquired "the right and easement of erecting, constructing, re-constructing, replacing, repairing, maintaining and using, from time to time as [PG&E] may see fit, for the transmission and distribution of electricity, and for all purposes connected therewith, upon, across, over and under the lands hereinafter described, conduits and lines, or lines, of poles and towers or either, and wires suspended thereon and supported thereby, and other structures, and wires for telephone and telegraph purposes, and all necessary and proper cross-arms, braces, connections, fastenings and other appliances and fixtures for use in connection therewith, and also a right of way and easement for the said structures and purposes, of a uniform width of one hundred (100) feet, the center line of which is hereinafter described, together with the right of ingress thereto and egress therefrom, upon, over, and across the said lands . . . ." The right-of-way provides that the utility will "have full right and liberty of using such right of way for all purposes connected with the construction, maintenance and use of said lines of poles or towers, wires, conduits and other structures." The right-of-way also provides, however, that the utility "shall avoid, so far as it reasonably can, interfering with the use by [Wilbur] of such lands for mining, agricultural and other purposes."

Wilbur's family has grown walnut trees in the easement area since the mid-1960's, and until 2008 PG&E had been trimming the trees periodically to a height of 12 feet to keep them clear of the power lines. In February 2008, however, Wilbur learned that PG&E planned to trim approximately 80 walnut trees to a height of seven feet and 40 trees to a height of 10 feet. A normal productive walnut tree is at least 12 feet high; a seven-foot tree is unproductive and worthless.

In March 2008, Wilbur objected to the "unreasonable tree trimming" and informed PG&E that any entry into the easement by PG&E or its contractors without Wilbur's permission would be considered a trespass.

On March 27, 2008, Wilbur sued PG&E for injunctive and declaratory relief to prevent PG&E from "unreasonably pruning trees and vegetation to the extent that they are destroyed or made economically unuseable" and to obtain a judicial determination that "the current and historic easement use is the limit of the easement despite any written description to the contrary" and a declaration of "the nature and extent of the pruning allowed to PG&E under the easement, and the limits on the easement."

PG&E demurred to the first amended complaint, contending the court did not have jurisdiction to interfere with the commission's regulation, supervision, and inspection of PG&E's vegetation management program and that injunctive relief would interfere with the rules and regulations of various agencies.

The trial court sustained the demurrer without leave to amend and dismissed Wilbur's complaint. The court reasoned the commission has "broad authority . . . to mandate utility line vegetation clearance requirements, and . . . the Superior Court lacks jurisdiction to invalidate, alter, or to otherwise interfere with the [commission]'s exercise of its jurisdiction." The court also concluded PG&E was "not limited to 'historical use' of the easement, but may comply with the [commission] requirements, even to the extent that compliance exceeds 'historical use.' "

Wilbur filed a timely notice of appeal from the judgment of dismissal.

## DISCUSSION

### I

### *Constitutional and Statutory Provisions Relating to the Commission*

"The commission is a state agency of constitutional origin with far-reaching duties, functions, and powers . . . including the power to fix rates, establish rules, hold various types of hearings, award reparation, and establish its own procedures." (*Consumers Lobby Against Monopolies v. Public Utilities Com.* (1979) 25 Cal.3d 891, 905 [160 Cal.Rptr. 124, 603 P.2d 41], citing Cal. Const., art. XII, §§ 1–6.) In addition, the Legislature, which has the " 'plenary power . . . to confer additional authority and jurisdiction upon the commission,' " can broaden the commission's authority. (*Consumers Lobby Against Monopolies, supra*, at p. 905, quoting Cal. Const., art. XII, § 5.)

Employing its plenary power, the Legislature enacted the Public Utilities Act (§ 201 et seq.), which "vests the commission with broad authority to 'supervise and regulate every public utility in the State.' " (*Covalt, supra*, 13 Cal.4th at p. 915.) This broad authority authorizes the commission to " 'do all things, whether specifically designated in [the Public Utilities Act] or in addition thereto, which are necessary and convenient' in the exercise of its jurisdiction over public utilities." (*Ibid.*, italics omitted.) " 'The commission's authority has been liberally construed' [citation], and includes not only administrative but also legislative and judicial powers . . . ." (*Ibid.*)

■ Commission action is subject to judicial review, the "manner and scope" of which is established by the Legislature. (Cal. Const., art. XII, § 5.) "Pursuant to this constitutional provision the Legislature enacted article 3 of chapter 9 of the Public Utilities Act, entitled 'Judicial Review . . .' (§ 1756 et seq.)," which "prescribes a method of judicial review that is narrow in both 'manner and scope.' " (*Covalt, supra,* 13 Cal.4th at p. 915.) Among the provisions of that article is subdivision (a) of section 1759, which provides that "[n]o court of this state, except the Supreme Court and the court of appeal, to the extent specified in this article, shall have jurisdiction to review, reverse, correct, or annul any order or decision of the commission or to suspend or delay the execution or operation thereof, or to enjoin, restrain, or interfere with the commission in the performance of its official duties, as provided by law and the rules of court."

Despite this limitation on the jurisdiction of trial courts to review commission rules and decisions, the Legislature has provided for a private right of action against utilities for unlawful activities and conduct. Specifically, section 2106 provides for an action to recover for loss, damage, or injury "in any court of competent jurisdiction" by any corporation or person against "[a]ny public utility which does, causes to be done, or permits any act, matter, or thing prohibited or declared unlawful, or which omits to do any act, matter, or thing required to be done, either by the Constitution, any law of this State, or any order or decision of the commission."

■ "[R]ecognizing a potential conflict between sections 2106 and 1759," the California Supreme Court "has held section 2106 'must be construed as limited to those situations in which an award of damages would not hinder or frustrate the commission's declared supervisory and regulatory policies.' " (*Koponen v. Pacific Gas & Electric Co.* (2008) 165 Cal.App.4th 345, 351 [81 Cal.Rptr.3d 22] (*Koponen*), quoting *Waters v. Pacific Telephone Co.* (1974) 12 Cal.3d 1, 4 [114 Cal.Rptr. 753, 523 P.2d 1161] (*Waters*).)

In *Covalt,* the Supreme Court " 'established a three-part test to determine whether an action is barred by section 1759: (1) whether the commission had the authority to adopt a regulatory policy; (2) whether the commission had exercised that authority; and (3) whether the superior court action would hinder or interfere with the commission's exercise of regulatory authority.' " (*Koponen, supra,* 165 Cal.App.4th 345, 351.)

With this background, we turn to the question of whether section 1759 bars the superior court from exercising jurisdiction over the Sarales' and Wilbur's claims against PG&E.

## II

### Jurisdiction over Claims of Excessive Tree Trimming by Electric Utility Companies

### A

### Part 1 of the Covalt Test: The Commission Has Authority to Regulate Tree Trimming Around Power Lines

■ The Sarales concede the commission "has authority to regulate trimming distances around power lines," and Wilbur does not argue otherwise. As we have noted, the commission has authority to "supervise and regulate every public utility in the State" and "do all things . . . necessary and convenient in the exercise of such power and jurisdiction." (§ 701.) More specifically, the commission has the express authority to "require every public utility" to maintain its systems and equipment "in a manner so as to promote and safeguard the health and safety of its employees, passengers, customers, and the public." (§ 768.) The regulating of tree trimming distances around power lines effectuates this purpose. As the commission itself has stated,[6] "The question of appropriate tree-trimming standards and practices has a broad reach, encompassing issues of worker safety, public safety, fire suppression, and environmental consequences . . . ." (*Bereczky v. Southern California Edison Co.* (1996) 65 Cal.P.U.C.2d 145, 147.) Thus, we conclude the commission's authority includes regulating tree trimming around power lines.

### B

### Part 2 of the Covalt Test: The Commission Has Exercised Its Regulatory Authority over Tree Trimming around Power Lines

The commission's general order No. 95 provides rules governing the construction of overhead electric lines. Rule 35 of general order No. 95 (rule 35) specifically governs tree trimming.

Before 1996, rule 35 provided only in "very general terms" that " '[w]here overhead wires pass through trees, safety and reliability of service demand that a reasonable amount of tree trimming be done in order that the wires may clear branches and foliage.' " (*Re San Diego Gas and Electric Co.* (1996)

---

[6] Together, the parties in both cases have made various requests for judicial notice of various material, including the decision of the commission quoted here. To the extent we have not already ruled on those requests, we grant all of them.

68 Cal.P.U.C.2d 333, 336.) Prompted by the "unfortunate fatality" of a farmworker, however, in 1994 the commission "opened [a] proceeding to investigate the tree trimming practices of SDG&E [San Diego Gas and Electric Company]." (*Id.* at pp. 335, 346.) A month later, the commission "expanded the scope of [its] investigation . . . for the purpose of reviewing [the] tree trimming practices" of "all other investor-owned California electric utilities" "to ensure that [its] investigation [would have] statewide scope and effect." (*Id.* at p. 335.)

In April 1996, a settlement was proposed that would adopt "[a] table of specific clearances . . . to provide ascertainable minimum standards under . . . rule [35]" and would add "certain exceptions . . . for circumstances where compliance by the utilities was either impracticable or beyond their control." (*Re San Diego Gas and Electric Co., supra,* 68 Cal.P.U.C.2d at p. 348.) In September 1996, the commission decided to "adopt the material terms of the settlement as an interim device to ensure public safety and system reliability" pending conclusion of the proceeding. (*Id.* at pp. 339, 341.) The interim modification of former rule 35 provided for certain "minimum clearances" that were to be maintained "between line conductors and vegetation under normal conditions." (68 Cal.P.U.C.2d at p. 348.) The modification also provided that the rule did "not apply where the utility has made a 'good faith' effort to obtain permission to trim or remove vegetation but permission was refused or unobtainable." (*Ibid.*)

In January 1997, the commission "adopt[ed] final standards for trimming trees which are in proximity to overhead electric lines of utilities within [its] jurisdiction." (*Re San Diego Gas and Electric Co.* (1997) 70 Cal.P.U.C.2d 693, 694.) The standards the commission adopted "mandate[d] minimum distances that must be maintained at all times between conductors and surrounding vegetation, and provide[d] additional guidelines for clearances that should be established at the time of trimming, where practicable, between vegetation and energized conductors and other live parts of the overhead lines." (*Ibid.*) In explaining its action, the commission stated as follows: "Our action today does not limit or mandate the maximum limits of tree trimming, or specify the manner in which trimming activities must be accomplished. We are selecting a safe minimum standard to insure system safety and reliability, but we are not adopting comprehensive rules and procedures to specify how the minimum obligation of the utilities must be accomplished. [¶] In recognition of this circumstance, we will decline to adopt a declaration of our jurisdiction as part of our order. In our view, such a course would be fraught with the danger of acting outside of our authority in this proceeding." (*Id.* at p. 699.)

In the wake of the commission's decision in January 1997, the first paragraph of former rule 35 provided as follows: "Where overhead wires pass

through trees, safety and reliability of service demand that tree trimming be done in order that the wires may clear branches and foliage by a reasonable distance. The minimum clearances established in Table 1, Case 13, measured between line conductors and vegetation under normal conditions, shall be maintained. (Also see Appendix E for tree trimming guidelines)." (See *Re San Diego Gas and Electric Co., supra*, 70 Cal.P.U.C.2d at pp. 701–702.)

Case No. 13 in table 1 specifies the minimum amount of radial clearance that must exist at all times between bare line conductors and tree branches or foliage. The guidelines in appendix E specify "minimum clearances that should be established, at time of trimming, between the vegetation and the energized conductors and associated live parts where practicable." The guidelines recognize that "[v]egetation management practices may make it advantageous to obtain greater clearances than those listed . . . ." (*Re San Diego Gas and Electric Co., supra*, 70 Cal.P.U.C.2d at p. 705.)

The exception to rule 35 that applies where the utility has made a good faith effort to obtain permission to trim or remove vegetation but permission was refused or unobtainable remains part of the rule in the wake of the commission's 1997 decision.

From the foregoing, it is quite apparent that the commission has exercised its jurisdiction to regulate tree trimming around power lines. The Sarales argue, however, that general order No. 95 represents only "a <u>limited</u> exercise of the commission's authority as to minimum trimming clearances." In the Sarales' view, the commission has "purposefully declined to exercise its regulatory authority as to maximum allowable trimming," and therefore the second part of the *Covalt* test is not satisfied because their claims relate to *excessive* trimming.

PG&E contends the Sarales' "interpretation of the matter at issue is far too narrow. The real matter at issue here is the management of vegetation near power lines—specifically, tree trimming. The [commission] has adopted extensive regulations in this area." PG&E also contends that "even if the matter at issue is considered to be maximum trimming allowances, . . . the [commission] has repeatedly exercised its jurisdiction and expressed its position on maximum trimming allowances."

For purposes of applying the *Covalt* test, it does not matter whether we characterize the commission's actions broadly, as addressing "the management of vegetation near power lines," or narrowly, as addressing "minimum [tree] trimming clearances." What matters is that the commission has exercised its authority to adopt a regulatory policy relating to tree trimming around power lines—regardless of how that policy may be characterized.

C

*Part 3 of the* Covalt *Test: Superior Court Action Will Hinder
or Interfere with the Commission's Regulatory Authority*

 The crucial question presented in these cases arises in part 3 of the *Covalt* test, which requires us to determine whether action by the superior court on the claims tendered by the Sarales and Wilbur would hinder or interfere with the commission's exercise of its regulatory authority. (*Koponen, supra,* 165 Cal.App.4th at p. 351.) " 'The [commission] has exclusive jurisdiction over the regulation and control of utilities, and once it has assumed jurisdiction, it cannot be hampered, interfered with, or second-guessed by a concurrent superior court action addressing the same issue.' " (*Covalt, supra,* 13 Cal.4th at p. 918, fn. 20, italics omitted, quoting *Barnett v. Delta Lines, Inc.* (1982) 137 Cal.App.3d 674, 681 [187 Cal.Rptr. 219].)

In *Covalt, supra,* 13 Cal.4th 893, the plaintiffs sued a power company for damages based on the emission of electromagnetic radiation from power lines on land adjacent to theirs. (*Id.* at pp. 910–911.) The Supreme Court determined that the commission was "still actively pursuing [a] broad policy inquiry into the potential health effects of powerline electric and magnetic fields that it initiated in 1991." (*Id.* at p. 934.) The court further determined that allowing the plaintiffs to recover damages for nuisance based on their claim that the electric and magnetic fields emanating from the power lines "would interfere with the policy of the commission on powerline electric and magnetic fields" because such recovery "would be inconsistent with the commission's conclusion . . . that the available evidence does *not* support a reasonable belief that 60 Hz electric and magnetic fields present a substantial risk of physical harm." (*Id.* at p. 939.)

The *Covalt* court emphasized: "Having thus vested this court with limited jurisdiction to review commission actions, the Legislature then made it clear in section 1759 of the Public Utilities Act that no other court has jurisdiction either to review or suspend the commission's decisions or to enjoin or otherwise 'interfere' with the commission's performance of its duties . . . ." (*Covalt, supra,* 13 Cal.4th at p. 916.) Thus, the *Covalt* court unanimously declared that "an action for damages against a public utility pursuant to section 2106 is barred by section 1759 *not only when* an award of damages would directly contravene a specific order or decision of the commission, i.e., when it would 'reverse, correct, or annul' that order or decision, *but also when an award of damages would simply have the effect of undermining a general supervisory or regulatory policy of the commission, i.e., when it would 'hinder' or 'frustrate' or 'interfere with' or 'obstruct' that policy."* (*Id.* at p. 918, italics added.) Consistent with this conclusion, the *Covalt* court

upheld the dismissal of a lawsuit claiming that electric and magnetic fields from high-voltage lines threatened the safety of nearby home occupants. (*Id.* at p. 951.) Because the commission had properly addressed the effects of electric and magnetic fields given off by power lines, the Supreme Court deferred to the commission's determination that the danger was inconsequential. (*Id.* at pp. 926–935.)

Our Supreme Court reached a similar conclusion in *Waters, supra,* 12 Cal.3d 1. *Waters* involved a plaintiff who sued a telephone company for damages for failing to provide adequate telephone service. (*Id.* at p. 4.) The Supreme Court held that section 1759 barred the action in superior court because "the commission has approved a general policy of limiting the liability of telephone utilities for ordinary negligence to a specified credit allowance, and has relied upon the validity and effect of that policy in exercising its rate-making functions." (12 Cal.3d at p. 10.) The *Waters* court declared that superior court actions alleging unlawful conduct by utilities "must be construed as limited to those situations in which an award of damages would not hinder or frustrate the commission's declared supervisory and regulatory policies." (*Id.* at p. 4.) Thus, the high court concluded that "to entertain suits such as plaintiff's action herein and authorize a substantial recovery from [the telephone company] would thwart the foregoing policy." (*Id.* at p. 10.)

Wilbur deemphasizes the result in *Covalt* and *Waters* to focus on the Court of Appeal's decision in *Koponen, supra,* 165 Cal.App.4th 345. The *Koponen* court held that landowners could proceed with a lawsuit against telecommunications companies seeking to add fiber optic cable alongside extant PG&E power line easements. (*Id.* at p. 348.) Although the commission had granted PG&E's application to allow telecommunications companies to install the fiber optic cables, the *Koponen* court concluded that the lawsuits could proceed because PG&E was seeking to allow a use of a right-of-way that the company did not own. (*Id.* at p. 353.)

Assuming that *Koponen* was correctly decided, the case is distinguishable. *Koponen* turned on the fact that the commission had authorized *a new, different, and additional* use of a right-of-way. Here, by contrast, the easements have been in use for the same purpose of power line siting and maintenance for a long time—since 1908 in the Wilbur case and 1915 in the Sarale case. The commission's tree trimming regulation does not apply a new, different, or additional use to the easement but seeks only to correct a practice that turned out to be unsafe under previous formulation. In short, the commission's guidelines for tree trimming addresses continuing safety concerns applicable to overhead power lines.

Already in 1915, the California Supreme Court noted that "the highly destructive power of electricity when carried in quantities sufficient for power purposes" required power companies "to exercise a high degree of care in placing the wires so as not to interfere with traffic on the ordinary highway and so as to avoid contact with and injury to any person or object which may reasonably be expected to pass under the wires." (*Fairbairn v. American River Electric Co.* (1915) 170 Cal. 115, 117–118 [148 P. 788].) Power line maintenance and safety protocols to avoid damage to areas surrounding the lines will continue to be in existence for the foreseeable future.

The Sarales' and Wilbur's suits against PG&E essentially advance claims of "excessive" tree pruning based on past vegetation management practices. Section 1759 saves the commission and utility companies from defending against myriad lawsuits every time adjustments are made to protocols for vegetation management around power lines. The record in this case indicates that clearances for vegetation management surrounding power lines were revised by the commission in 1948, 1962, 1964, 1966, 1967, 1968, 1980, 1988, 1990, 1992, 1996, 1997, and 2005. Allowing owners of land containing overhead power lines to seek individualized judicial determinations of what might be "necessary" or "proper" vegetation would cause a regulatory nightmare for the commission that section 1759 was intended to prevent.

■ Consistent with section 1759, the superior court may adjudicate whether a utility has an easement on a particular parcel of real property, and, if so, whether the grant creating the easement specifies any unit measure distance limit on tree trimming (e.g., 27 feet from the center of the power lines).

None of the plaintiffs in these cases base their claims on an allegation that PG&E trimmed trees beyond a distance measure set forth in a grant creating the utility easement. Instead, the Sarales characterize the trimming as being beyond *what the commission has mandated.* Thus, the Sarales contend the trimming exceeds the scope of PG&E's easement to the same extent that PG&E exceeded the commission's guidelines. Similarly, at oral argument, Wilbur conceded that he does not seek to challenge any trimming by PG&E that is mandated by the commission. Indeed, Wilbur admitted he could not bring such a suit. Instead, he seeks to challenge trimming by PG&E that is beyond the minimum clearances *established by the commission,* as well as beyond PG&E's historical tree trimming practices on his property.

■ The commission's adoption of a minimum trimming standard reflects its determination that, in every situation, trimming clearance must meet the minimum standard in order to sufficiently ensure the safety of the electric system, surrounding property, and the public. Such a standard necessarily

recognizes that, in certain situations, safety considerations will demand that trimming exceed the minimum. The question of whether trimming must exceed the minimum standards on any particular section of an overhead power line is a factual issue that is within the exclusive jurisdiction of the commission to decide. (*Covalt, supra*, 13 Cal.4th at p. 918.) Consequently, the trial courts in these cases correctly determined that they lacked jurisdiction to adjudicate the Sarales' and Wilbur's challenges to the trimming by PG&E as excessive.

### D

■ Our holding does not leave the Sarales and Wilbur without a remedy for excessive tree trimming. Plaintiffs may contest rule 35's necessity and implementation before the commission. (See, e.g., *Morgan v. Pacific Gas and Electric Company* (1987) 25 Cal.P.U.C.2d 393, 394–395 [adjudicating complaint that requested penalties against PG&E and its contractors for "mutilating" trees in the Russian River area under the authority of gen. order No. 95].) Exhaustion of administrative remedies is usually the correct answer to challenge of a regulatory rule. " 'The purpose of the rule of exhaustion of administrative remedies is to provide an administrative agency with the opportunity to decide matters in its area of expertise prior to judicial review. [Citation.] The decisionmaking body " 'is entitled to learn the contentions of interested parties before litigation is instituted.' " ' " (*State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 794 [39 Cal.Rptr.3d 189], quoting *Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 384 [110 Cal.Rptr.2d 579].)
■ Here, the exhaustion requirement comports with section 1759's intent to allow the commission to act effectively in safeguarding people and property from danger.

■ In supplemental briefing filed at our request, the commission informs us that one of these remedies is injunctive relief by which the commission enjoins a utility from engaging in a particular action. "The Commission uses the same standard as California courts to decide if a [temporary restraining order] (TRO) should be issued. Under this standard, the moving party must show all of the following: (1) irreparable injury to the moving party without the TRO; (2) no harm to the public interest; (3) no substantial harm to other interested parties; and (4) a likelihood of prevailing on the merits." (*Application of San Diego Gas & Electric Co. for Review of Its Proactive De-Energization Measures and Approval of Proposed Tariff Revisions (U902E) (Decision Granting the Motion for a Temporary Restraining Order Regarding San Diego Gas & Electric Company's Power Shut-off Plan)* (2009) Cal.P.U.C. Dec. No. 09-08-030 [2009 Cal.P.U.C. Lexis

423, pp. *8–*9].) Thus, the commission may grant timely and appropriate relief in instances of excessive vegetation management by a California utility company.

In short, section 1759 does not leave plaintiffs without a remedy for excessive tree trimming by PG&E. However, their remedy lies before the commission rather than in superior court.

### E

Having determined that the trial courts lacked jurisdiction to adjudicate plaintiffs' claims that the tree trimming on their properties was excessive, we turn to the question of whether the Sarales are entitled to remand for adjudication of their claim that PG&E does not have an easement at all on their land.[7] As we shall explain, the grant of a right-of-way in favor of the utility company attached by the Sarales to their first amended complaint conclusively refutes their denial of the easement.

The first paragraph of the Sarales' first amended complaint states: "Written easements upon Plaintiffs' land claimed by Defendants are attached as Exhibit 'B' to this complaint . . . ." Exhibit B contains the 1915 grant of right-of-way for electric transmission lines on the land now owned by the Sarales. In pertinent part, the grant provides the utility company with "the right of erecting, constructing, reconstructing, replacing, repairing, maintaining and using for the transmission and distribution of electricity, a single line of towers and wires suspended thereon and supported thereby, and wires for telephone and telegraph purposes, and all necessary and proper . . . appliances and fixtures for use in connection therewith, and also a right of way along the same of a uniform width of 25 feet . . . , together with the right of ingress thereto and egress therefrom . . . ." The right-of-way further gives PG&E "full right and liberty of cutting and clearing away all trees and brush on either side of said center line whenever necessary or proper for the convenient use and enjoyment of the said line of towers and wires and right of way . . . ."

Even though the Sarales attached the grant of a right-of-way to their complaint, they nonetheless deny the existence of the easement. Specifically, their first amended complaint states: "Plaintiffs do not admit that this easement burdens PLAINTIFFS' LAND."

On appeal from a judgment of dismissal after the sustaining of a demurrer, a court must "treat as true not only the complaint's material factual allegations, but also facts that may be implied or inferred from those expressly

---

[7] Wilbur's complaint does not deny the existence of the utility easement on his property.

alleged." (*Poseidon Development, Inc. v. Woodland Lane Estates, LLC* (2007) 152 Cal.App.4th 1106, 1111–1112 [62 Cal.Rptr.3d 59].) We also "accept as true both facts alleged in the text of the complaint and facts appearing in exhibits attached to it. If the facts appearing in the attached exhibit contradict those expressly pleaded, those in the exhibit are given precedence. (*Dodd* v. *Citizens Bank of Costa Mesa* (1990) 222 Cal.App.3d 1624, 1626–1627 [272 Cal.Rptr. 623].)" (*Mead v. Sanwa Bank California* (1998) 61 Cal.App.4th 561, 567–568 [71 Cal.Rptr.2d 625].) Here, the grant of a right-of-way attached by the Sarales to their first amended complaint conclusively negates an allegation of the Sarales' complaint, namely the nonexistence of the utility easement on their land. The Sarales' allegation cannot withstand the clear proof of the easement's existence provided by the language of the 1915 grant.

██ No interpretation of the scope of the easement described in the grant is necessary to dispose of the Sarales' denial of the easement's existence. However, even if it were, the scope of an easement presents a question of law rather than a factual dispute. " 'Under section 806 of the Civil Code "the extent of a servitude is determined by the terms of the grant . . ." . . . .' (*Pasadena v. California-Michigan etc. Co.* (1941) 17 Cal.2d 576, 578 [110 P.2d 983].) 'In construing an instrument conveying an easement, the rules applicable to the construction of deeds generally apply.' (*Scruby v. Vintage Grapevine, Inc.* [(1995)] 37 Cal.App.4th [697,] 702 [43 Cal.Rptr.2d 810]; see also Civ. Code, § 1066 [grants interpreted as contracts].) The instrument, 'unless it is ambiguous, must be construed by a consideration of its own terms. *The meaning and intent thereof is a question of law* and the reviewing court is not bound by the trial court's findings and conclusions regarding such intent and meaning. [Citations.]' (*Keeler v. Haky* (1958) 160 Cal.App.2d 471, 474 [325 P.2d 648].)" (*Gray v. McCormick* (2008) 167 Cal.App.4th 1019, 1024 [84 Cal.Rptr.3d 777], italics added.)

The Sarales plead no *facts* suggesting that the plain terms of the PG&E right-of-way are ambiguous or uncertain. Their allegation that "Plaintiffs do not admit that this easement burdens PLAINTIFFS' LAND" contains no facts suggesting why this is so. The allegation is both a contention and a conclusion of law. As such, it is insufficient to negate the clear facts of the pleaded right-of-way. " 'We treat the demurrer as admitting all material facts properly pleaded, *but not contentions, deductions, or conclusions of fact or law.* [Citation.]" (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58], italics added, quoting *Serrano v. Priest* (1971) 5 Cal.3d 584, 591 [96 Cal.Rptr. 601, 487 P.2d 1241].)

In short, there is no remaining factual dispute in the Sarales' case because the existence of the easement is established by the exhibit attached to their complaint. (*Mead v. Sanwa Bank California, supra,* 61 Cal.App.4th at

pp. 567–568.) For lack of factual dispute in the Sarales' case, the demurrer was properly granted without leave to amend and the judgment of dismissal correctly entered.

## F

Our conclusion that the judgments of dismissal must be affirmed obviates our need to discuss the Sarales' arguments that the trial court erred by (1) granting PG&E's motion to strike their complaint after sustaining PG&E's demurrer without leave to amend, (2) admitting improper, extrinsic evidence regarding "proper tree-trimming standards," and (3) failing to grant a stay of the action so they could challenge PG&E's action before the commission. The trial court's lack of jurisdiction under section 1759 disposes of these contentions.

So too, we need not consider Wilbur's argument that the trial court erred in concluding that PG&E is "not limited to 'historical use' of the easement, but may comply with the [commission] requirements, even to the extent that compliance exceeds 'historical use.' " This conclusion constituted an alternate basis for sustaining PG&E's demurrer because the trial court concluded Wilbur was not entitled to the judicial declaration he sought. A correct judgment must be affirmed regardless of the trial court's reasoning. (*People v. Smithey* (1999) 20 Cal.4th 936, 971–972 [86 Cal.Rptr.2d 243, 978 P.2d 1171].) Consequently, we need not address the trial court's alternate basis for a judgment of dismissal correctly entered against Wilbur.

## DISPOSITION

The judgments of dismissal in cases Nos. C059873 (Sarale) and C060515 (Wilbur) are affirmed. In both cases, PG&E shall recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)

Scotland, Acting P. J.,* concurred.

**SCOTLAND, Acting P. J.,*** Concurring.—Having concurred fully in the majority opinion, I write separately to respond to the analysis in the dissent written by my colleague and dear friend. He believes that, in exercising its regulatory authority over vegetation management regarding electrical power lines, the Public Utilities Commission (PUC) has done nothing more than

---

*Retired Presiding Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

establish minimum clearance standards for tree trimming around power lines. Not so. The PUC's general order No. 95, former rule 35 specifies that, where overhead electrical power lines pass through trees, the safety and reliability of the electrical service demand that tree trimming be done to ensure that branches and foliage are a "reasonable distance" away from the power lines. By going on to specify minimum clearance standards, the PUC has not limited its regulatory authority over tree trimming to merely ensuring compliance with its minimum standards. The overriding requirement is that foliage must be a reasonable distance away from the power lines, with a reasonable distance never being less than the minimum clearance standards. This necessarily means that, in some situations, public safety and the reliability of the electrical service may require a greater than minimum clearance between foliage and power lines. This determination is squarely within the exclusive regulatory authority of the PUC.

Contrary to my dissenting colleague's claim, the PUC *does* disagree with his analysis of its authority. In its amicus curiae brief, the PUC acknowledges it has "traditionally left matters of easement construction and interpretation to the Courts." However, it steadfastly asserts that where, as in the cases now before us, a public utility has a power line easement, the PUC has "exclusive," "broad and continuing supervisory and regulatory [authority] to oversee utility vegetation management," including "utility tree trimming practices." Stated another way, "whether the degree of trimming exceeded or violated any applicable Commission-approved rules" is "an issue subject to the Commission's exclusive jurisdiction." Accordingly, "any determination" by a court that requires a finding "whether the trimming was excessive or unlawful under existing requirements" would "interfere with the Commission's authority to interpret and apply its own rules, orders, and decisions governing utility vegetation management." This is so because "only the Commission can determine whether the trimming in question was within the spirit and intent of its own rules." "To seek such a determination a landowner would file a formal complaint with the [PUC]." Remedies the PUC may provide include injunctive relief, and the imposition of fines and penalties, but not the award of damages. However, if the PUC finds that the utility engaged in unreasonable vegetation management, the aggrieved landowner could file an action in the superior court to obtain damages.

For reasons stated in the majority opinion, which I have signed, the PUC's position is correct and the analysis of the dissent is not persuasive.

**ROBIE, J.,** Dissenting.—I respectfully dissent.

## I

### *Adjudication of These Cases Would Not Interfere with the Commission's Exercise of Its Regulatory Authority*

My colleagues conclude that adjudication of these cases by the superior court would interfere with California's Public Utilities Commission's (the commission) exercise of its regulatory authority over vegetation management[1] around power lines. They are wrong. Let me explain why.

### A

### *What Plaintiffs Seek*

First, we need to focus on what plaintiffs seek in these actions. The first appeal (case No. C059873) is from a judgment of dismissal in San Joaquin County Superior Court case No. CV033900. Plaintiffs are William R. Sarale (as an individual) and Julie Ann Sarale (as an individual and as the trustee of two trusts). We will refer to this case as the Sarale case and to these plaintiffs as the Sarales. The second appeal (case No. C060515) is from a judgment of dismissal in Yuba County Superior Court case No. YCSCCVCV080000252. Plaintiff is Richard G. Wilbur, as a trustee. We will refer to this case as the Wilbur case and to this plaintiff as Wilbur. We will refer to the Sarales and Wilbur collectively as plaintiffs. Essentially, Wilbur and the Sarales each seek a determination by the superior court that the extent to which Pacific Gas and Electric Company (PG&E) has been trimming, or wants to trim, the walnut trees under and around its power lines exceeds the scope of the utility's easements over plaintiffs' orchards.[2] Stated another way, Wilbur and the Sarales seek a determination that PG&E does not have a property right to trim as much of the trees as the utility has been trimming or wants to trim.

Both Wilbur and the Sarales admit, however, that they are *not* challenging any trimming by PG&E that is consistent with the *minimum* distances the commission has established in rule 35. In other words, they admit that the

---

[1] I use the term "vegetation management" rather than "tree trimming" because the commission recently revised rule 35 of general order No. 95 to make that same change. The commission's general order No. 95 provides rules governing the construction of overhead electric lines. Rule 35 of general order No. 95 (rule 35) specifically governs tree trimming.

[2] As a threshold matter, the Sarales also seek a determination of whether PG&E has any easement at all. I discuss that issue later.

terms of PG&E's easements (if any) over their property allow PG&E to trim at least as much of the trees as the commission has determined must or should be trimmed.[3]

To that end, in their complaint the Sarales specifically seek an injunction preventing PG&E from "destroying vegetation or trimming crops under cultivation . . . to the extent that such activity *exceeds* acts authorized, regulated or controlled within the exclusive jurisdiction of the [commission]." (Italics added.) Similarly, at oral argument before this court, Wilbur conceded he does not seek to challenge any trimming by PG&E that complies with the minimum distances the commission has established.

What is at issue here, then, is whether any trimming *beyond* what the commission has mandated or recommended in rule 35 and its guidelines is within the scope of PG&E's easements, and if so, how much.

The question of whether an activity by an easement holder is within or without the scope of the easement is one that has traditionally been for the courts to decide, even when the easement holder is a public utility. For example, in *Krieger v. Pacific Gas & Electric Co.* (1981) 119 Cal.App.3d 137 [173 Cal.Rptr. 751], a landowner sued PG&E for damages and a permanent injunction to prevent PG&E from lining with gunite a section of a ditch that crossed the landowner's property. (*Id.* at p. 141.) The "essential controversy" in that case was whether PG&E's "easement rights to [the] ditch . . . encompasse[d] the right to line the earthen ditch with the concrete-like gunite." (*Ibid.*)

Here, the essential controversy is whether PG&E's easement rights over plaintiffs' walnut orchards encompass the right to trim vegetation around and underneath the utility's power lines *beyond* the minimum distances the commission has established. It is the adjudication of *this* controversy that my colleagues wrongly believe will interfere with the commission's exercise of its regulatory authority.

B

*What the Commission Has Done*

Having identified what plaintiffs seek in these actions, the next step in understanding why my colleagues are wrong is to focus on exactly how the

---

[3] I say "must or should" because rule 35 *mandates* the minimum distance that "shall be maintained" between power lines ("line conductors") and surrounding vegetation at all times, but the guidelines to the rule only *recommend* the minimum distance that "should be established, at time of trimming." Obviously, the latter distance is greater than the former to allow for growth of the vegetation.

commission has exercised its regulatory authority over vegetation management around power lines. As the majority agrees, what the commission has done in this area is promulgate rule 35 (and its accompanying guidelines). (Maj. opn., *ante*, at pp. 237–239.) As I have explained, and as the majority opinion acknowledges, through that rule the commission has mandated certain minimum clearances that must be maintained between power lines and surrounding vegetation at all times and has recommended certain greater clearances that should be established at the time of trimming. (*Id.* at pp. 237–240.) What the rule does *not* do, however, is recommend or mandate any *maximum* clearances. (*Id.* at p. 239.) In other words, the commission has told public utilities like PG&E that they should trim surrounding vegetation a certain distance away from their power lines at the time of trimming and that they must maintain a certain, lesser clearance at all times, but the commission has not told the utilities when they should or must *stop* trimming.

It is also worth noting that the requirements of rule 35—including the supposedly "mandatory" minimum clearance that is to be maintained at all times—"do not apply where the utility has made a 'good faith' effort to obtain permission to trim or remove vegetation but permission was refused or unobtainable." Thus, even the commission itself recognizes that it does not have the power to endow a utility with the property right to trim vegetation and that, in certain instances, the power of the property owner to control his or her own property may trump the commission's power to regulate vegetation management around power lines.

## C

*Why Giving Plaintiffs What They Seek Would Not Interfere*
*with What the Commission Has Done*

With this understanding of what the commission has done in mind, the question for us is whether superior court action in these cases would " 'hinder' or 'frustrate' or 'interfere with' or 'obstruct' " (*San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 918 [55 Cal.Rptr.2d 724, 920 P.2d 669] (*Covalt*)) this particular "exercise of regulatory authority" (*Koponen v. Pacific Gas & Electric Co.* (2008) 165 Cal.App.4th 345, 351 [81 Cal.Rptr.3d 22]) by the commission. My colleagues conclude the answer to that question is yes, but their explanation for that answer is no explanation at all.

The majority opinion first asserts that "[s]ection 1759 saves the commission and utility companies from defending against myriad lawsuits every time adjustments are made to protocols for vegetation management around power lines" because "[a]llowing owners of land containing overhead power lines to

seek individualized judicial determinations of what might be 'necessary' or 'proper' vegetation would cause a regulatory nightmare for the commission that [Public Utilities Code[4]] section 1759 was intended to prevent." (Maj. opn., *ante*, at p. 242.) There are multiple problems with this assertion.

First, the issue presented by these cases does not raise any specter of litigation against *the commission*; the issue is only whether landowners should be allowed to bring legal actions against utility companies based on the allegation that the companies are acting beyond the scope of their easements. How such suits would pose "a regulatory nightmare for the commission" is far from clear.

Second, given the majority opinion's reference to the commission's supposed "revis[ion]" of "clearances for vegetation management surrounding power lines" numerous times between 1948 and 2005 (maj. opn., *ante*, at p. 242), I understand the opinion's reference to "adjustments" to "protocols" to be a reference to those supposed revisions. Thus, my colleagues appear to be attributing the present lawsuits to recent "adjustments" or "revisions" the commission made to "clearances for vegetation management surrounding power lines," and they appear to be saying that it is the potential proliferation of such lawsuits every time the commission makes such adjustments that would interfere with the commission's exercise of its regulatory authority. Ignoring the fact that the commission has *not* repeatedly revised or adjusted "clearances for vegetation management surrounding power lines," as the majority suggests,[5] the majority's assertion is based on a false premise. Moreover, even assuming it were not, the majority still fails to explain just how allowing these lawsuits, or other lawsuits like them, to go forward would interfere with the commission's exercise of its regulatory authority.

On the first point, there is no evidence of which I am aware, nor does the majority cite any, to suggest that these lawsuits were, in fact, triggered by any action the commission took in "adjusting" or "revising" the "protocols" or "clearances" "for vegetation management surrounding power lines." As I have explained, and as my colleagues elsewhere agree, the only regulatory

---

[4] All further section references are to the Public Utilities Code.

[5] Elsewhere, the majority correctly notes that "[b]efore 1996, rule 35 provided only in 'very general terms' " for " ' "a reasonable amount of tree trimming" ' " (maj. opn., *ante*, at p. 237), and it was only in 1996 that the commission first adopted specific minimum clearances, which became final in 1997 (maj. opn., *ante*, at pp. 238–239). The majority's mistaken belief that the commission adopted "clearances for vegetation management surrounding power lines" before 1996 appears to be based on the fact that the table that contains the earlier dates to which the majority refer encompasses clearances not only from "tree branches or foliage," but also clearances from railroads, thoroughfares, buildings, and other objects. It was revisions to the clearances from these objects other than vegetation that were presumably made between 1948 and 1996.

action the commission has taken with respect to vegetation management around power lines is in its promulgation of rule 35, which prescribes the minimum trimming a utility must or should do. As the majority opinion explains, the " 'final standards for trimming trees . . . in proximity to overhead electric lines' " were adopted in January 1997. (Maj. opn., *ante*, at p. 238.) Thereafter, up until 2009, they remained unchanged.[6] It defies logic to suggest, without evidence, that it was the adoption of the minimum clearances in 1997—which, as previously explained, *these plaintiffs do not challenge*—that led to these lawsuits. What led to these lawsuits (according to plaintiffs) was that (1) in 2004 PG&E began trimming more from the Sarales' walnut trees than the utility was mandated to trim and more than it had ever trimmed historically; and (2) in 2008, Wilbur learned that PG&E's intended trimming of his walnut trees "would be much greater than ever occurred throughout the history of the Wilbur farming operation going back to 1957." In neither case was it the commission's "adjustment" of "clearances" that led to litigation.

Even assuming there was evidence these cases were triggered by some "adjustment" the commission made to the minimum clearances the commission established in rule 35 and its guidelines, the majority still fails to explain how allowing these lawsuits to go forward will interfere with the commission's exercise of its regulatory authority—*given that the plaintiffs in both cases do not challenge any trimming that falls within the minimum clearances the commission has established*. This is the fundamental flaw in the majority opinion and the point at which I most clearly part company with my colleagues.

The majority's explanation on this point is found (if at all) in the following paragraph: "The commission's adoption of a minimum trimming standard reflects its determination that, in every situation, trimming clearance must meet the minimum standard in order to sufficiently ensure the safety of the electric system, surrounding property, and the public. Such a standard necessarily recognizes that, in certain situations, safety considerations will demand that trimming exceed the minimum. The question of whether trimming must

---

[6] As previously noted, the majority opinion refers to the commission's supposed revision of "clearances for vegetation management surrounding power lines" numerous times up until 2005. (Maj. opn., *ante*, at p. 242.) The action the commission took in 2005 to which the majority refers, however, had nothing to do with clearances for vegetation management. The majority relies on a "Note" listing revision dates to table 1 of general order No. 95 (of which rule 35 is a part). The last revision date in that "Note" is "January 13, 2005 by Decision No. 0501030." Review of that decision, which appears as exhibit 13 in volume I of the appendix to PG&E's request for judicial notice, reveals it had nothing to do with the minimum clearances for vegetation around power lines and did not change those clearances.

In August 2009, the commission adopted "interim revisions to Appendix E to General Order 95" to "increase the minimum clearance at the time of trim for 'Extreme and Very High Fire Threat Zones' in Southern California."

exceed the minimum standards on any particular section of the overhead power line is a factual issue that is within the exclusive jurisdiction of the commission to decide. (*Covalt, supra*, 13 Cal.4th at p. 918.)" (Maj. opn., *ante*, at pp. 242–243.)

I have no quarrel with the assertion in the first sentence; undoubtedly, public safety is the overriding purpose for which the commission adopted minimum clearances.

I do not agree with the assertion in the second sentence, however. The commission's determination that certain minimum clearances must be maintained at all times to ensure public safety does not "recognize[] that, in certain situations, safety considerations will demand that trimming exceed the minimum." On the contrary, presumably the commission chose minimum clearance thresholds that are sufficient, in all circumstances to which they apply, to provide the level of public safety the commission deems sufficient. Of course, if a certain minimum distance is sufficient to provide the level of public safety the commission deems appropriate, then a greater distance obviously would provide a greater level of safety, but that assertion is not the same as the one the majority makes. And, in any event, the proposition that greater distance means greater safety casts no light on the issue of whether allowing the superior courts to adjudicate these cases would interfere with the commission's exercise of its regulatory authority over vegetation management around power lines. The fact remains that in exercising its regulatory authority in this area, all the commission has chosen to do is establish minimum clearances; the commission has not spoken on the issue of *maximum* clearances.

And why would it? Since greater distance means greater safety, and the commission's primary interest in this area is ensuring public safety, what interest would the commission have in telling utilities where to *stop* trimming? With public safety as their lodestar, presumably the commission and the utilities would prefer that all vegetation underneath the utilities' power lines be razed completely, as this would provide the maximum level of public safety. The commission has not mandated such drastic action, however. What the commission has mandated is certain minimum clearances that must be maintained at all times and others that should be established at the time of trimming. And, as I have explained, the question here is whether it would interfere with this exercise of the commission's regulatory authority over vegetation management around power lines if the superior courts were allowed to determine whether trimming *beyond* these minimum clearances is within the scope of PG&E's easements. Nothing in the majority's opinion adequately explains why it would, and this is particularly true with respect to the third sentence in the majority's central paragraph, to which I now turn.

The heart of the majority's analysis (or lack thereof) appears to rest on the ipse dixit assertion that "[t]he question of whether trimming must exceed the minimum standards on any particular section of the overhead power line is a factual issue that is within the exclusive jurisdiction of the commission to decide." (Maj. opn., *ante*, at p. 243.) Under the legal principles on which we all agree (maj. opn., *ante*, at p. 236), section 1759 operates to give the commission exclusive jurisdiction over an issue *only if superior court action on that issue would interfere with the commission's exercise of regulatory authority*. Thus, the commission has exclusive jurisdiction to decide the "factual issue" "of whether trimming must exceed the minimum standards on any particular section of an overhead power line" (maj. opn., *ante*, at p. 243) only if superior court action on that issue would interfere with the commission's exercise of regulatory authority relating to that issue. What appears to be the assertion at the heart of the majority's analysis only begs the question we are called on to decide—would giving plaintiffs what they seek interfere with what the commission has done? Unfortunately, the majority's cite to *Covalt*, by which it purports to support its ipse dixit assertion, is of no assistance on this point because at that point the *Covalt* decision does no more than state the applicable rule which frames the question. (See *Covalt, supra*, 13 Cal.4th at p. 918 ["an action for damages against a public utility pursuant to section 2106 is barred by section 1759 not only when an award of damages would directly contravene a specific order or decision of the commission, i.e., when it would 'reverse, correct, or annul' that order or decision, but also when an award of damages would simply have the effect of undermining a general supervisory or regulatory policy of the commission, i.e., when it would 'hinder' or 'frustrate' or 'interfere with' or 'obstruct' that policy"].)

In the end, then, the majority opinion never explains how or why superior court action in these cases would interfere with the commission's exercise of its regulatory authority over vegetation management around power lines, when the commission's exercise of its authority has been limited to prescribing the minimum trimming a utility must or should do but has not addressed when that trimming should stop, and where plaintiffs do not challenge any trimming that is consistent with the minimum clearances the commission has established.

To me, it appears self-evident that where the commission's minimums will remain inviolate, there can be no interference with what the commission has done, since all it has done is establish those minimums, and *conditionally* at

that.[7] Nevertheless, let me drive the point home by a brief comparison of this case to some of the other cases in which interference was or was not found.

In *Waters v. Pacific Telephone Co.* (1974) 12 Cal.3d 1 [114 Cal.Rptr. 753, 523 P.2d 1161], the plaintiff sued a telephone company for damages for failing to furnish her with adequate telephone service, as required by section 451. (*Waters*, at p. 4.) The commission, however, had "adopted a policy of limiting the liability of telephone utilities . . . for acts of ordinary negligence to a specified credit allowance, as set forth in approved tariff schedules which form a contract with telephone service customers," and the Supreme Court concluded that "[s]ince an award of substantial damages to plaintiff would be contrary to the policy adopted by the commission and would interfere with the commission's regulation of telephone utilities, . . . section 1759 bars the instant action." (*Ibid.*)

It is readily apparent how allowing the lawsuit to go forward in *Waters* would have interfered with the commission's exercise of its regulatory authority—because an award of damages for providing inadequate telephone service would have directly contradicted the limitation on such liability the commission had adopted.

In *Covalt*, the plaintiffs brought a nuisance action against the utility that ran electric currents through power lines adjacent to their property on the theory that electric and magnetic fields arising from the power lines "impaired their use and enjoyment of the property simply because they assertedly *feared* that the fields would cause them physical harm." (*Covalt, supra*, 13 Cal.4th at pp. 910–911, 939.) The commission had concluded, however, following a significant amount of investigation (*id.* at pp. 926–934), "that the available evidence d[id] *not* support a reasonable belief that 60 Hz electric and magnetic fields present a substantial risk of physical harm," and the Supreme Court decided that an award of damages for nuisance on the theory presented by plaintiffs "would be inconsistent with the commission's conclusion" (*id.* at p. 939).

Again, it is readily apparent how allowing the lawsuit to go forward in *Covalt* would have interfered with the commission's exercise of its regulatory authority—because an award of damages for nuisance based on the theory that the plaintiffs reasonably feared harm from the electric and magnetic fields arising from the power lines would have directly contradicted the commission's conclusion that, based on the available evidence, any such fear was not reasonable.

---

[7] The minimum clearances are conditional because, as I have noted, they do not apply where the utility has made a good faith effort to obtain permission to trim or remove vegetation but permission was refused or unobtainable.

A suitable case in contrast to *Waters* and *Covalt* is *Cellular Plus, Inc. v. Superior Court* (1993) 14 Cal.App.4th 1224 [18 Cal.Rptr.2d 308], which the Supreme Court cited and discussed with approval in *Covalt*. (*Covalt, supra*, 13 Cal.4th at p. 919.) In *Cellular Plus*, Cellular Plus (and others) sued "the two licensed providers of cellular telephone service in San Diego County" "for wholesale price fixing and retail price fixing under the Cartwright Act." (*Cellular Plus*, at p. 1229.) The defendant providers argued that the commission had "exclusive jurisdiction by statute to determine whether rates for cellular telephone service in California are reasonable, and the price fixing claims . . . amount[ed] to no more than claims that the prices charged by [the providers were] unreasonable." (*Id.* at p. 1244.) The appellate court rejected this argument, stating, "[w]e cannot conceive how a price fixing claim under the Cartwright Act could 'hinder or frustrate' the [commission]'s supervisory or regulatory policies. The only apparent policy of the [commission] that could be affected is its regulation of rates charged by cellular telephone service providers. However, Cellular Plus does not dispute that the [commission] has jurisdiction over rates, nor does it seek any relief requiring the [commission] to change any rates it has approved. Cellular Plus is merely seeking treble damages and injunctive relief for alleged price fixing under the Cartwright Act." (*Cellular Plus*, at p. 1246.)

Much like *Cellular Plus* in the foregoing case, plaintiffs here do not dispute that the commission has jurisdiction over vegetation management around power lines, and they do not seek any relief that would require the commission to change the minimum clearances the commission has established in the exercise of that jurisdiction. What they are seeking is a judicial determination that PG&E, in trimming *beyond* the minimum clearances the commission has mandated or recommended, has *exceeded the scope of its easements over plaintiffs' walnut orchards.* Unlike in *Waters* and *Covalt*, such a determination would not directly contradict any regulatory action the commission has taken. On the contrary, like the appellate court in *Cellular Plus*, I cannot conceive how plaintiffs' actions here *could* in any way hinder, frustrate, or interfere with the commission's regulatory policies regarding vegetation management around power lines.

D

*The Commission Does Not Disagree*

My conclusion that allowing these cases to go forward would not interfere with the commission's exercise of its regulatory authority is actually supported

by the amicus curiae brief the commission filed in this court at our request. In its brief, the commission acknowledges that it "has traditionally left matters of easement construction and interpretation to the Courts, and it would continue to do so here," and "it is within the Court's jurisdiction to order injunctive or other relief" where "the Court finds that the easements preclude the action complained of." Elsewhere, the commission states more bluntly that "a determination of property rights under any easement is properly an issue for the Courts." The commission does contend that only it may determine whether "the degree of trimming exceeded or violated any established rules" of the commission, but that contention is of no consequence because neither Wilbur nor the Sarales allege that PG&E violated any commission rule. Instead, both cases involve the issue of what *property right* PG&E has to trim walnut trees on plaintiffs' properties under PG&E's easements over those properties (if any). And the commission expressly admits that *this* "is properly an issue for the Courts."

Through their action, the Sarales seek to establish that by trimming more than the commission requires or recommends, and more than it has historically trimmed,[8] PG&E has exceeded its property rights under its easement (assuming it has any easement at all) by trimming more than is "necessary or proper for the convenient use and enjoyment of the . . . line of towers and wires and right of way." As for Wilbur, the right-of-way over his property requires PG&E to "avoid, so far as it reasonably can, interfering with the use by [Wilbur] of [the easement] for . . . agricultural . . . purposes." Thus, through his action, Wilbur seeks to establish that by trimming the walnut trees within the easement beyond what the commission requires or recommends, and beyond what PG&E has historically trimmed, PG&E will be exceeding its property rights under its easement by unreasonably interfering with Wilbur's use of the land for agricultural purposes. In both cases, then, the issue raised is the extent of PG&E's property rights under its easements and not whether PG&E has violated any rule or decision of the commission. Accordingly, the commission itself has essentially admitted that the superior court is the proper place for both of these cases to be and to proceed.

---

[8] PG&E's historic use of the easements in both cases is relevant to the scope of those easements because " '[w]here the grant is general as to the extent of the burden to be imposed on the servient tenement, an exercise of the right, with the acquiescence and consent of both parties, in a particular course or manner, fixes the right and limits it to that particular course or manner.' " (*San Joaquin & Kings etc. Co. v. Egenhoff* (1943) 61 Cal.App.2d 82, 86 [141 P.2d 939].)

E

*The Majority's Consolation Prize Is No Prize at All*

I also must take issue with the consolation prize the majority opinion purports to give plaintiffs in asserting that they are not left "without a remedy for excessive tree trimming by PG&E." (Maj. opn., *ante*, at p. 244.) Essentially, my colleagues assert that plaintiffs may seek injunctive relief before the commission to remedy the problem. (Maj. opn., *ante*, at pp. 243–244.) While they may *seek* it, the commission will not grant it. Accordingly, the alternate remedy my colleagues suggest is chimerical, and Wilbur and the Sarales are actually left with no means of establishing that PG&E is trampling on their property rights by exercising competing property rights that the utility does not actually have.

In its amicus curiae brief, the commission contends that it provides "a forum for a landowner to seek a determination whether a utility's vegetation management activities were unreasonable or unlawful in connection [with] the Public Utilities Code and/or Commission orders, rules and decisions." Elsewhere, the commission asserts it has exclusive jurisdiction over "whether the degree of trimming exceeded or violated any applicable Commission-approved rules." The commission also notes that while it cannot award damages, it can grant injunctive relief "should the Commission determine that the utility has violated the law."

Neither of these cases, however, presents a question of whether PG&E's trimming of the walnut trees on plaintiffs' properties violated a provision of the Public Utilities Code, or a commission order, rule, or decision. Indeed, no such claim would be viable because, as I have explained, the commission's regulatory action with respect to vegetation management around power lines has been limited to setting minimum clearances, and the commission has not spoken on the issue of where trimming should stop. Indeed, the commission has already *rejected* at least two complaints by landowners who sought redress for excessive tree trimming because the commission does not regulate maximum limits on trimming.

In *Morgan v. PG&E* (1987) 25 Cal.P.U.C.2d 393, a landowner filed a complaint with the commission alleging that PG&E had allowed its tree trimming contractor to " 'mutilate' " trees in the Russian River area by "cut[ting] away too much foliage, producing clearances which are much greater than necessary for safety." (*Id.* at p. 394.) The landowner relied on a commission staff guideline that he asserted established maximum distances

for trimming. (*Ibid.*) The commission rejected his argument, noting that the guideline was "merely a staff interpretation of the more general provisions of [general order No.] 95," which at that time did not prescribe specific distances, and that "the [staff guideline] specifies minimum, not maximum, separation distances." (*Ibid.*) As one of its conclusions of law, the commission concluded that "[e]xcessive trimming if proven would not violate any Commission order." (*Id.* at p. 396.)

This conclusion—that the commission's rules and orders do not regulate the maximum trimming a utility can do—was reiterated nine years later in *Bereczky v. Southern California Edison Co.* (1996) 65 Cal.P.U.C.2d 145. There, a landowner complained for money damages and other relief on the ground that the utility had " 'excessively trimmed spruce and pine trees' on [his] property." (*Id.* at p. 146.) The landowner argued that general order No. 95 " 'requires and/or implies' reasonable and consistent practices and action by the utilities." (*Bereczky*, at p. 147.) The commission dismissed the complaint, noting that because its rules do "not fix a maximum limit on the amount of trimming which a utility is permitted to do on easements under its power lines," "even if proven, the conduct alleged does not constitute the basis for a complaint . . ." in front of the commission. (*Ibid.*) As one of its conclusions of law, the commission concluded that "[t]he complaint does not set forth acts by [the utility] which are in violation, or could be claimed to be in violation of any provision of law, or of any order or rule of the Commission, which we are empowered to enforce." (*Id.* at p. 148.)

Nothing has changed since 1996 to suggest the commission would, or could, reach a different result in the cases now before us. While the commission's adoption of specific minimum clearances postdates its decision in *Bereczky* by a year, it remains true to this day that commission rules do not fix a maximum limit on the amount of trimming a utility may do on easements under its power lines. Absent any pertinent rule, the commission is not going to get involved in a dispute over excessive trimming where, as here, the only limitation on which plaintiffs rely is a limitation in the easements the utility claims over their properties, because—as the commission itself admits—"a determination of property rights under any easement is properly an issue for the Courts." Accordingly, the remedy my colleagues purport to leave plaintiffs to in this case is, in fact, no remedy.

Indeed, by relegating landowners like Wilbur and the Sarales to a remedy that does not exist, the majority opinion creates a serious anomaly. In effect, what the decision does is turn the commission's creation of minimum

clearances that are, by the very terms of the commission's own rule, conditional on obtaining permission to trim from the landowner, into an absolute right for a utility to trim as much vegetation as it wants to trim, permission or not, no matter whose property rights are involved, and no matter what the scope of the utility's right-of-way may be, assuming it has one. In the world my colleagues create, even if a utility has an easement that specifically limits the amount of vegetation it can trim to a fixed distance from its power lines, and that distance is less than the minimum clearance the commission requires, the utility can nonetheless trim to the commission's minimum clearance, or even more, and section 1759 would foreclose the landowner from seeking relief in court for the utility's acts in excess of its easement rights.

At oral argument, however, PG&E admitted that in such a scenario it would have to either purchase or condemn a more extensive easement; the commission could not simply regulate a more extensive easement into existence. This is entirely consistent with the principle that "the commission has no regulatory authority or interest in private disputes over property rights between PG&E and private landowners." (*Koponen v. Pacific Gas & Electric Co., supra*, 165 Cal.App.4th at p. 353.) Nevertheless, that is where the majority opinion leaves us—PG&E has the power (if not the right) to trim as much vegetation as it wants, and there is nothing Wilbur and the Sarales can do about it. I simply cannot go along with such an absurd result.

II

*The 1915 "GRANT OF RIGHT OF WAY" Attached to the
Sarales' Complaint Does Not Contradict Their Denial 92
Years Later That PG&E Does Not Have Any Easement*

I also disagree with the majority's determination that the Sarales are not entitled to proceed with their case to obtain a determination of whether PG&E has *any* easement over their property. According to the majority opinion, "the grant of a right-of-way in favor of [PG&E] attached by the Sarales to their first amended complaint conclusively refutes their denial of the easement." (Maj. opn., *ante*, at p. 244.) Again, my colleagues are wrong.

At the threshold, I acknowledge we can take judicial notice of the 1915 "GRANT OF RIGHT OF WAY" the Sarales attached as exhibit B to their first amended complaint—even though the Sarales may have attached it only "for purposes of describing [PG&E]'s contentions as to the existence and terms of [the claimed] easement[]"—because a recorded deed is subject to

judicial notice either under subdivision (g) of Evidence Code section 452, which allows a court to take judicial notice of "[f]acts and propositions that are of such common knowledge within the territorial jurisdiction of the court that they cannot reasonably be the subject of dispute" (see *Evans v. California Trailer Court, Inc.* (1994) 28 Cal.App.4th 540, 549 [33 Cal.Rptr.2d 646]), or under subdivision (h) of that statute, which allows a court to take judicial notice of "[f]acts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy" (see *Satchmed Plaza Owners Assn. v. UWMC Hospital Corp.* (2008) 167 Cal.App.4th 1034, 1040–1041 [84 Cal.Rptr.3d 585]).

Applying the provisions of Evidence Code section 452 to the "GRANT OF RIGHT OF WAY," this court can take judicial notice of the "fact" that in October 1915, C.H. Howland and Rose E. Howland granted a right-of-way over certain land in San Joaquin County to PG&E for an electric transmission line. Beyond that, however, the "GRANT OF RIGHT OF WAY" does not establish anything that needs to be established to prove that the easement created by this document *continues to exist to this date, burdens the property now owned by the Sarales, and is owned by PG&E.*

First, the "GRANT OF RIGHT OF WAY" does not establish that the land over which the Howlands gave PG&E a power line easement in 1915 is the land the Sarales own and which is the subject of the present action. Perhaps a comparison of exhibit A to the Sarales' first amended complaint (which, according to paragraph one of that complaint, contains a description of the Sarales' property) to the legal description contained in the "GRANT OF RIGHT OF WAY" would resolve this question. The "GRANT OF RIGHT OF WAY" alone, however, does not establish this "fact."

Second, even assuming we can determine that the land at issue in this case is the same land over which the Howlands gave PG&E a power line easement in 1915, the "GRANT OF RIGHT OF WAY" does not establish anything about what may have happened between October 1915 and December 2007, when the Sarales filed their first amended complaint, to alter the easement granted under the "GRANT OF RIGHT OF WAY." In other words, the "fact" that in 1915 PG&E had a power line easement over what was to become the Sarales' property does not establish that 92 years later, in 2007, when the Sarales filed their first amended complaint, PG&E still owned that easement. The only "fact" the "GRANT OF RIGHT OF WAY" establishes is that PG&E *had* a power line easement back in 1915.

Because the only "fact" the "GRANT OF RIGHT OF WAY" establishes does not necessarily contradict the Sarales' allegation that the easement established in that document 92 years earlier does not burden their land today, the exhibit does *not* "conclusively negate[] an allegation of the Sarales' complaint." (Maj. opn., *ante*, at p. 245.) Accordingly, the majority opinion is wrong on this point as well.

## III

### *The Rest of the Issues*

Because they reach incorrect conclusions on the two main questions discussed above, my colleagues do not have to reach a number of other arguments presented in these cases.

### A

### *The Sarale Case*

In its brief in the Sarale case, PG&E argues that granting the relief the Sarales seek would interfere with the ongoing supervision of the utility by state and federal regulators other than the commission which protect the public's interest in safe and reliable transmission of electricity. PG&E did not make this argument in the trial court.[9] Nevertheless, even if this court exercises its discretion to consider this argument made for the first time on appeal (see *Koch v. Rodlin Enterprises* (1990) 223 Cal.App.3d 1591, 1595 [273 Cal.Rptr. 438]), the argument is without merit.

After spending six pages of its brief purporting to detail its supervision by the Federal Energy Regulatory Commission, the North American Electric Reliability Corporation, the Western Electricity Coordinating Council, and the California Independent System Operator corporation, PG&E summarizes that it "has complex and interwoven layers of regulators and must comply with extensive federal and state regulations regarding vegetation management that are intended to ensure the safe and reliable delivery of electric power." PG&E then asserts the bare conclusion that "[p]ursuant to . . . section 1759, the trial court therefore lacked subject-matter jurisdiction to address [the Sarales'] claims."

---

[9] PG&E did make a similar argument in the Wilbur case relating to Wilbur's claim for injunctive relief, but PG&E has not renewed that argument in the appeal in that case.

By its terms, section 1759 limits the power of the superior court to review or otherwise interfere with actions by *the commission* only; the statute does not deal with any other regulatory body. Even assuming for the sake of argument that granting relief in the Sarale case would interfere with PG&E's regulation by one of the other entities it identifies, section 1759 does not deprive the superior court of jurisdiction based on that fact.

In addition to challenging the trial court's ruling on PG&E's demurrer, the Sarales contend the trial court erred in granting PG&E's motion to strike because that ruling was "irreconcilable and inconsistent with its denial of jurisdiction." We agree. Once the trial court determined that section 1759 barred it from exercising jurisdiction in the Sarale case, the motion to strike was moot, and the court had no business ruling on it. If the judgment of dismissal were reversed, however, the motion to strike would be ripe for decision, and the trial court could reconsider that motion on remand.

B

*The Wilbur Case*

In its order preceding the judgment of dismissal, the trial court in the Wilbur case concluded PG&E is "not limited to 'historical use' of the easement, but may comply with the [commission] requirements, even to the event that compliance exceeds 'historical use.'" To the extent this conclusion can be understood as an alternate basis for sustaining PG&E's demurrer—because the trial court concluded Wilbur was not entitled to the judicial declaration he sought—I agree with Wilbur that the trial court erred.

"The basic rule is that, if an actual controversy appears from the complaint (as it does here), the plaintiff is entitled to the declaration of rights that he seeks, whether that declaration is in his favor or is adverse to his position." (*Los Angeles County Democratic Central Committee v. County of Los Angeles* (1976) 61 Cal.App.3d 335, 338 [132 Cal.Rptr. 43].)

Here, it cannot be determined from the face of the complaint, or materials subject to judicial notice, whether PG&E's proposed additional trimming of Wilbur's walnut trees exceeds the scope of PG&E's easement over Wilbur's property—which is the substance of Wilbur's complaint. Thus, Wilbur's complaint was not subject to resolution on demurrer.

## IV

### *Conclusion*

For the foregoing reasons, I would reverse the judgment of dismissal in each case and would remand each case to the trial court with directions to vacate the order sustaining the demurrer without leave to amend and enter a new order overruling the demurrer. Additionally, in the Sarale case, I would direct the trial court to vacate its order granting the motion to strike and to reconsider that motion.

A petition for a rehearing was denied November 9, 2010, and the petitions of all appellants for review by the Supreme Court were denied January 26, 2011, S188401. Chin, J., and Corrigan, J., did not participate therein. Kennard, J., was of the opinion that the petitions should be granted.