# IN THE SUPREME COURT OF CALIFORNIA

ANTHONY GANTNER,

Plaintiff and Appellant,

v.

PG&E CORPORATION et al.,

Defendants and Respondents.

S273340

Ninth Circuit

21-15571

Northern District of California

4:20-cv-02584-HSG

November 20, 2023

Justice Liu authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Groban, Jenkins, Evans, and O'Rourke[*] concurred.

---

[*] Associate Justice of the Court of Appeal, Fourth Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

GANTNER v. PG&E CORPORATION

S273340

Opinion of the Court by Liu, J.

Pacific Gas and Electric Company (PG&E) conducted a series of emergency power shutoffs, called Public Safety Power Shutoffs (PSPS), throughout the fall of 2019 to reduce the risk that its utility infrastructure would ignite a wildfire during extreme weather conditions. Plaintiff Anthony Gantner alleges that these power shutoffs were necessitated by PG&E's negligence in maintaining its power grid over multiple decades and that Californians harmed by these shutoffs are entitled to $2.5 billion in damages.

While Public Utilities Code section 2106 provides a private right of action against utilities, section 1759 of the same code bars actions that would interfere with the California Public Utilities Commission (PUC) in the performance of its official duties. (All undesignated statutory references are to the Public Utilities Code.) We consider here, in response to a request by the United States Court of Appeals for the Ninth Circuit, whether section 1759 bars a lawsuit that seeks damages resulting from PSPS events where the suit alleges that a utility's negligence in maintaining its grid necessitated the shutoffs but does not allege that the shutoffs were unnecessary or violated PUC regulations. We hold that allowing suit here would interfere with the PUC's comprehensive regulatory and supervisory authority over PSPS. Section 1759 therefore bars Gantner's suit. The Ninth Circuit also asked us to decide

1

whether PG&E Electric Rule No. 14 (Tariff Rule 14) shields PG&E from liability, but we do not reach that issue.

## I.

Gantner filed a class action complaint against PG&E in 2019 in the Bankruptcy Court for the Northern District of California as part of PG&E's Chapter 11 bankruptcy proceedings. Gantner alleges that PG&E negligently maintained its power grid and electrical equipment for decades and that this negligence forced the utility to implement a series of PSPS in 2019 to reduce the risk of wildfires. The PSPS events in question led to "many days" without power for Gantner and other California residents and business owners, who requested class damages of $2.5 billion to compensate for the "loss of habitability of their dwellings, loss of food items in their refrigerators, expenses for alternative means of lighting and power, . . . loss of cell phone connectivity, dangerous dark conditions, lack of running water, and loss of productivity and business." Gantner does not allege that the 2019 PSPS were unnecessary or that they were implemented in contravention of PUC regulations or policies.

PG&E moved to dismiss Gantner's complaint, arguing that the bankruptcy court lacked subject matter jurisdiction under section 1759 because Gantner's suit would interfere with the PUC's supervision and regulation of the PSPS scheme. (See *San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 918 (*Covalt*).) Alternatively, PG&E argued that its own "Tariff Rule 14 provides that the decision to shut off a customer's power cannot trigger liability when, in PG&E's 'sole opinion', it is necessary for public safety." The bankruptcy court concluded that section 1759 bars Gantner's action and dismissed the

complaint without leave to amend and without addressing PG&E's Tariff Rule 14 argument. On appeal, the United States District Court for the Northern District of California affirmed the dismissal based on section 1759 preemption. Gantner appealed to the Ninth Circuit, which issued an order requesting that this court answer two questions concerning California law.

We granted the Ninth Circuit's request to consider two questions: "(1) Does California Public Utilities Code [section] 1759 preempt a plaintiff's claim of negligence brought against a utility if the alleged negligent acts were not approved by the California Public Utilities Commission, but those acts foreseeably resulted in the utility having to take subsequent action (here, a Public Safety Power Shutoff), pursuant to CPUC guidelines, and that subsequent action caused the plaintiff's alleged injury? (2) Does PG&E's Electric Rule Number 14 shield PG&E from liability for an interruption in its services that PG&E determines is necessary for the safety of the public at large, even if the need for that interruption arises from PG&E's own negligence?"

## II.

" 'The [Public Utilities] [C]ommission is a state agency of constitutional origin with far-reaching duties, functions and powers. (Cal. Const., art. XII, §§ 1–6.) The Constitution confers broad authority on the commission to regulate utilities, including the power to fix rates, establish rules, hold various types of hearings, award reparation, and establish its own procedures. (*Id.*, §§ 2, 4, 6.)' " (*Covalt, supra*, 13 Cal.4th at pp. 914–915.) "The Constitution also confers plenary power on the Legislature to 'establish the manner and scope of review of

3

commission action in a court of record' (Cal. Const., art. XII, § 5)." (*Id.* at p. 915.)

## A.

We start by examining the background of PSPS, along with the PUC's supervision and regulation of those procedures. "Over the last decade, California has experienced increased, intense, and record-breaking wildfires . . . . These fires have resulted in devastating loss of life and damage to property and infrastructure." (*Decision Adopting De-Energization (Public Safety Power Shut-Off) Guidelines (Phase 1 Guidelines)* (May 30, 2019) Cal.P.U.C. Dec. No. 19-05-042 [2019 Cal.P.U.C. Lexis 270, *2].) While the underlying causes of wildfires are complex and varied, failure of electric utility infrastructure can ignite fires. (*Id.* at pp. *2–*3.) The risks of infrastructure failure and wildfire ignition increase in conjunction with certain conditions such as low humidity, high winds, and dry vegetation. (*Id.* at pp. *3–*4.) Conversely, proper maintenance of utility infrastructure can reduce these risks and increase safety. (*Id.* at p. *105.)

Electric utilities are required to operate their grids in ways that "promote the safety [and] health" of the public. (§ 451; see also § 399.2, subd. (a)(1) [requiring electrical utilities to operate their grids safely].) The PUC has determined that these statutory provisions provide authority for utilities "to shut off power in emergency situations when necessary to protect public safety." (*Decision Denying Without Prejudice San Diego Gas & Electric Company's Application to Shut Off Power During Periods of High Fire Danger* (Sept. 10, 2009) Cal.P.U.C. Dec. No. 09-09-030 [2009 Cal.P.U.C. Lexis 437, *98].) Nevertheless, when San Diego Gas & Electric (SDG&E) sought approval of a

proposed PSPS program in 2009, the PUC denied its request and encouraged SDG&E to continue considering options to reduce the risk of catastrophic wildfires, reminding the utility that any proposals must employ a cost-benefit analysis that weighs the benefits of reduced wildfire risk against the costs to customers and communities. (*Id.* at p. *1.)

In 2012, the PUC provided PSPS guidelines applicable only to SDG&E, explaining what actions a utility must take before and after shutting off power, the factors the PUC would consider in assessing the reasonableness of an emergency power shutoff, and how shutoffs would be reviewed and evaluated by regulators. (*Decision Granting Petition to Modify Decision 09-09-030 and Adopting Fire Safety Requirements for San Diego Gas & Electric Company* (Apr. 19, 2012) Cal.P.U.C. Dec. No. 12-04-024 [2012 Cal.P.U.C. Lexis 165, *48–*52].) In 2018, following what was then "the most destructive wildfire season on record," the PUC extended de-energization policies and procedures to all investor-owned electric utilities, including PG&E. (*Resolution Extending De-Energization Reasonableness, Notification, Mitigation and Reporting Requirements in Decision 12-04-024 to All Electric Investor Owned Utilities* (July 12, 2018) Cal.P.U.C. Res. No. ESRB-8 [2018 Cal.P.U.C. Lexis 330, *4].)

In 2019, the PUC promulgated a set of formal PSPS guidelines, acknowledging that "[w]ith the growing threat of wildfire, utilities will proactively cut power to lines that may fail in certain weather conditions in order to reduce the likelihood that their infrastructure could cause or contribute to a wildfire." (Cal.P.U.C. Dec. No. 19-05-042, *supra,* 2019 Cal.P.U.C. Lexis 270 at p. *3.) These binding guidelines, along with those adopted in Resolution ESRB-8, "remain in effect unless and until they are superseded by another Commission decision or

resolution." (Cal.P.U.C. Dec. No. 19-05-042, *supra*, 2019 Cal.P.U.C. Lexis 270 at p. *202.)

The PUC's guidelines require utilities to undertake a public notice and community engagement process, to notify customers affected by de-energization as soon as practicable, to create plans for mitigating harm from de-energization, and to promptly submit a report to the PUC following each de-energization event. (Cal.P.U.C. Res. No. ESRB-8, *supra*, 2018 Cal.P.U.C. Lexis 330 at pp. *10–*16.) The PUC also may conduct post hoc reasonableness reviews of de-energization events "to ensure that the power shut off is executed only as a last resort and for good reason." (*Id.* at p. *8; see *ibid.* [listing factors identified by PUC as pertinent to its reasonableness review, including the utility's de-energization alternatives, reasonable belief in "an imminent and significant" fire risk, and "efforts to mitigate the adverse impacts" of a power shutoff].) Before implementing a shutoff, utilities must conduct a cost-benefit analysis to "determine[] that the benefit of de-energization outweigh[s] potential public safety risks." (Cal.P.U.C. Dec. No. 19-05-042, *supra*, 2019 Cal.P.U.C. Lexis 270 at p. *237.)

Meanwhile, the Legislature in 2016 passed Senate Bill No. 1028, which added section 8386 requiring electric utilities to submit annual wildfire mitigation plans to the PUC for review. (Stats. 2016, ch. 598, § 1; see § 8386, subd. (b).) In 2018, the Legislature expanded section 8386 to specify that wildfire mitigation plans shall include "[p]rotocols for . . . deenergizing portions of the electrical distribution system that consider the associated impacts on public safety." (Stats. 2018, ch. 626, § 38; see § 8386, subd. (c)(6).) Effective July 1, 2021, the Legislature transferred the responsibility to "oversee and enforce electrical

corporations' compliance with wildfire safety" to the Office of Energy Infrastructure Safety (OEIS). (Stats. 2019, ch. 81, § 7; see § 326, subds. (a)(1), (b).) At the same time, the Legislature clarified that "[n]othing in this chapter [describing the power of OEIS] affects the commission's authority or jurisdiction over an electrical corporation, electrical cooperative, or local publicly owned electric utility." (§ 8385, subd. (b).) The PUC thus continues to have responsibility for ratifying PSPS plans approved by the Wildfire Safety Division of OEIS (§ 8386.3, subd. (a)), evaluating utilities' pre-season and post-season reports on PSPS (*Decision Adopting Phase 3 Revised and Additional Guidelines and Rules for Public Safety Power Shutoffs (Proactive De-Energizations) of Electric Facilities to Mitigate Wildfire Risk Caused by Utility Infrastructure* (June 24, 2021) Cal.P.U.C. Dec. No. 21-06-034 [2021 Cal.P.U.C. Lexis 305, *167–*173]), and conducting investigations and levying penalties against utilities for noncompliance with PSPS rules and regulations (see, e.g., *[Proposed] Administrative Enforcement Order in the matter of Pacific Gas & Electric Company's Execution of 2020 Public Safety Power Shutoff Events* (June 15, 2022) available at <https://www.cpuc.ca.gov/-/media/cpuc-website/divisions/safety-and-enforcement-division/acos-and-aeos/pge-administrative-enforcement-order---2020.pdf> [as of Nov. 14, 2023] (brackets in original) [proposing to fine PG&E $12 million and implement corrective action for regulatory violations during 2020 PSPS events]; all Internet citations in this opinion are archived by year, docket number, and case name at http://www.courts.ca.gov/38324.htm).

In February 2019, PG&E submitted its annual wildfire mitigation plan to the PUC. This plan contained PG&E's proposed PSPS program, including: "(1) PSPS decision factors;

(2) strategies to enhance PSPS efficiency while reducing associated impacts; (3) PSPS notification strategy; and (4) re-energization strategy." The PUC approved PG&E's plan as compliant with the requirements of section 8386, subdivision (c), while also noting that "several aspects of the company's planned mitigation . . . require improvement or other follow-up activity."

After the fall 2019 PSPS events that form the basis of this action, PG&E submitted reports on the power shutoffs to the PUC. The PUC found that during the PSPS events, PG&E violated the Public Utilities Code and PUC guidelines due to "the unavailability and non-functionality of [PG&E's] website," "the inaccuracy of its online outage maps" showing affected areas, the "constructive[] inaccessib[ility]" of its secure data transfer portals, and its "failure to provide advanced notification to approximately 50,000 customers," including "approximately 1,100 Medical Baseline customers." (*Decision on Alleged Violations of Pacific Gas and Electric Company with Respect to its Implementation of the Fall 2019 Public Safety Power Shutoff Events* (Sept. 23, 2021) Cal.P.U.C. Dec. No. 21-09-026 [2021 Cal.P.U.C. Lexis 480, \*110].) For these violations, the PUC fined PG&E over $106 million. (*Id.* at p. \*112.) In a separate investigation into the same PSPS events, the PUC concluded that among other violations of the Public Utilities Code, PG&E "failed to identify the possible safety risks resulting from an electric power shutoff" and "failed to evaluate these safety risks as part of the analysis of weighing the benefits and risks." (*Decision Addressing the Late 2019 Public Safety Power Shutoffs by Pacific Gas and Electric Company, Southern California Edison Company, and San Diego Gas & Electric Company to Mitigate the Risk of Wildfire Caused by Utility Infrastructure*

(June 3, 2021) Cal.P.U.C. Dec. No. 21-06-014 [2021 Cal.P.U.C. Lexis 278, *312–*313].)

## B.

This case concerns the bounds of section 1759 preemption. By statute, public utilities remain liable for "any act, matter, or thing prohibited or declared unlawful," as well as for omissions of "any act, matter, or thing required to be done." (§ 2106.) This private right of action is limited by section 1759, which divests all courts except this court and the Court of Appeal of jurisdiction "to review, reverse, correct, or annul any order or decision of the commission or to . . . enjoin, restrain, or interfere with the commission in the performance of its official duties." (§ 1759, subd. (a).)

"[I]n order to resolve the potential conflict between sections 1759 and 2106, the latter section must be construed as limited to those situations in which an award of damages would not hinder or frustrate the commission's declared supervisory and regulatory policies." (*Waters v. Pacific Telephone Co.* (1974) 12 Cal.3d 1, 4 (*Waters*).) Preemption under section 1759 is not limited to actions that "would directly contravene a specific order or decision of the commission." (*Covalt, supra*, 13 Cal.4th at p. 918.) An action is also barred if it "would simply have the effect of undermining a general supervisory or regulatory policy of the commission, i.e., when it would 'hinder' or 'frustrate' or 'interfere with' or 'obstruct' that policy." (*Ibid.*, fn. omitted.) Section 1759 bars an action when three requirements are met: (1) the PUC had the authority to adopt certain regulations or policies; (2) the PUC actually exercised that authority; and (3) the action would interfere with the PUC's exercise of that

authority. (*Hartwell Corp. v. Superior Court* (2002) 27 Cal.4th 256, 266 (*Hartwell*).)

Where "the relief sought would . . . interfere[] with a broad and continuing supervisory or regulatory program of the commission," section 1759 bars the action. (*Covalt, supra*, 13 Cal.4th at p. 919.) In *Waters*, a customer sought damages from her telephone company for its alleged failure to provide adequate phone service. (*Waters, supra*, 12 Cal.3d at p. 4.) We explained that because the PUC "ha[d] adopted a policy of limiting the liability of telephone utilities . . . for acts of ordinary negligence to a specified credit allowance," allowing a suit for damages "would be contrary to the policy adopted by the commission and would interfere with the commission's regulation of telephone utilities." (*Ibid.*) Section 1759 therefore barred the customer's action. (*Ibid.*)

Similarly, in *Covalt*, homeowners sued an electric utility, arguing that by increasing the number of power lines near the plaintiffs' home, the utility had " 'dramatically increased the dangerous levels of electromagnetic radiation flowing onto plaintiffs' property.' " (*Covalt, supra*, 13 Cal.4th at p. 911.) Over the previous decade, the PUC had undertaken a lengthy and thorough review of the available scientific evidence, had determined that the evidence did not establish that electric and magnetic fields (EMF) were dangerous, and had issued a seven-point EMF policy. (*Id.* at pp. 926–934.) We held that because the suit sought a court determination that EMF "are in fact dangerous," a determination that "would plainly undermine and interfere with [PUC] policy" (*id.* at p. 947), section 1759 barred the action (*id.* at p. 903).

And in *Hartwell*, plaintiffs sued water utilities for providing allegedly contaminated drinking water, regardless of whether the contaminants exceeded the levels allowed by the PUC. (*Hartwell*, *supra*, 27 Cal.4th at pp. 275–276.) Section 1759 barred the subset of claims based "on the theory that the public utilities provided unhealthy water, even if that water actually met [Department of Health Services] and PUC standards." (*Hartwell*, at p. 276.) At the same time, "damage claims based on the theory that the water failed to meet federal and state drinking water standards [were] not preempted by section 1759." (*Ibid.*) "A jury award based on a finding that a public water utility violated [state] standards would not interfere with the PUC regulatory policy requiring water utility compliance with those standards." (*Ibid.*)

## III.

With this background in mind, we turn to the present case. The parties agree that the PUC has the authority to regulate PSPS and that it has exercised that authority. Gantner does not challenge the PUC's general PSPS regulations or policies, nor does he challenge the procedures undertaken by the PUC to create those policies. He does not allege that PG&E's 2019 shutoff events were unnecessary or that they were conducted in violation of PUC regulations or requirements, and we have no occasion to consider how section 1759 might apply to a suit predicated on PUC findings that a utility violated PUC guidelines by or while implementing a PSPS event. Further, Gantner does not seek damages or injunctive relief based on harms resulting directly from PG&E's negligent grid maintenance. Rather, he alleges that PG&E's negligent maintenance caused the need for the 2019 PSPS events, which in turn led directly to the alleged damages. The question is

whether Gantner's action would interfere with the PUC's exercise of its authority to regulate PSPS.

## A.

Gantner alleges that the fall 2019 PSPS events "were a direct and legal result of the negligence" of PG&E in maintaining its grid and that "PG&E breached its duty of care to millions of its customers *by shutting off their power . . . .*" (Italics added.) Gantner's suit, while alleging negligence by PG&E in grid maintenance only, claims that all of the alleged harm — and all damages sought — flow directly from PG&E's fall 2019 PSPS events. To award damages on this theory, a court would have to find that PG&E breached its duty by negligently maintaining its grid and that this negligence foreseeably caused the PSPS events and resulting harms. But the PUC has already instituted procedures for evaluating PSPS before and after a power shutoff, along with its own criteria for examining the propriety of each PSPS decision. Although the PUC has conducted extensive investigation into the fall 2019 PSPS events, Gantner's suit does not adopt any of the PUC's findings or conclusions. Rather, by claiming damages for PSPS events without regard to whether those events were necessary or properly executed under PUC guidelines, Gantner's suit impermissibly interferes with the PUC's supervisory policies regarding both PSPS implementation and post hoc reasonableness review.

First, Gantner's suit would interfere with the PUC's "broad and continuing supervisory . . . program" over the implementation of PSPS events. (*Covalt, supra,* 13 Cal.4th at p. 919.) For over a decade, the PUC has emphasized that a utility's decision to shut off power must stem from its

overarching duty to protect public safety. (Cal.P.U.C. Dec. No. 09-09-030, *supra*, 2009 Cal.P.U.C. Lexis 437 at p. *98.) PUC guidelines provide that before deciding to implement a PSPS event, "a utility must first engage in a critical analysis." (Cal.P.U.C. Dec. No. 21-06-014, *supra*, 2021 Cal.P.U.C. Lexis 278 at p. *54.) The utility must "identify and consider the safety risks to the public from shutting off electric power," and "then the utility must weigh the risks of a PSPS event against the benefits of initiating a PSPS event." (*Ibid.*) The PUC has "explained, in detail, the potential for 'significant' adverse impacts on the general public as a result of power shutoffs due to wildfire concerns." (*Id.* at p. *13; see *id.* at pp. *13–*14 [describing 15 categories of harm that may result from power shutoffs].) Nevertheless, the PUC has authorized the regulated use of PSPS events as a "last resort," endorsing the practice where the public safety benefits of a reduced risk of wildfire ignition outweigh the harms of lost power. (Cal.P.U.C. Res. No. ESRB-8, *supra*, 2018 Cal.P.U.C. Lexis 330 at p. *8.)

By seeking billions of dollars in alleged damages resulting directly from power shutoffs, Gantner's suit would " 'hinder' or 'frustrate' " the PUC's carefully designed implementation calculus. (*Covalt*, *supra*, 13 Cal.4th at p. 918.) In *Hartwell*, section 1759 barred suit against regulated water providers where water contaminant levels remained below maximum limits allowed by the PUC. (*Hartwell*, *supra*, 27 Cal.4th at p. 276.) Where the PUC has decided that a certain level of contamination is acceptable, an action seeking damages for contamination below that threshold " 'would plainly undermine the commission's policy.' " (*Ibid.*) Nothing in *Hartwell* suggests that a plaintiff can avoid section 1759 preemption simply by alleging that a permissible level of contamination occurred as a

result of a water provider's impermissible negligence. This is for good reason: section 1759 preemption turns on the constitutional and statutory authority of the PUC rather than simply the underlying behavior of the utility. (See *Waters*, *supra*, 12 Cal.3d at p. 10 ["general principles which might govern disputes between private parties are not necessarily applicable to disputes with regulated utilities"].)

It is true that in *Hartwell* the PUC concluded that water complying with permissible contamination levels was " ' "in no way harmful or dangerous to health" ' " (*Hartwell*, *supra*, 27 Cal.4th at p. 263), whereas here the PUC acknowledged the harms caused by PSPS. But the PUC approved a system of PSPS decision-making based on the conclusion that in certain conditions, the harms of PSPS are outweighed by the benefits of wildfire prevention. Gantner seeks damages resulting from PSPS events without alleging negligence in the decision to shut off power or in PSPS implementation. *Hartwell* held that a utility could not be liable for contamination levels that fell within PUC-approved levels; here, PG&E cannot be liable for implementing PSPS events that, as far as the complaint alleges, fully complied with PUC guidelines. To hold otherwise would be to invite interference with a " 'broad and continuing supervisory or regulatory program' of the PUC." (*Id.* at p. 276.) A suit alleging that a utility implemented PSPS events in violation of PUC guidelines might present different considerations under *Hartwell*. But we decline to speculate on section 1759's application to such a case.

Gantner contends that PUC guidelines do not permit a utility to consider its risk of liability to customers affected by PSPS events as part of the balancing necessary to justify PSPS implementation. Thus, he argues, a damage award for the

harms caused by PSPS events would fall outside of, and therefore would not frustrate, the PUC's regulatory framework. Assuming without deciding that Gantner is correct that PUC guidelines bar utilities from considering the liability risk from a power shutoff, this argument is not persuasive.

First, Gantner's argument fails to account for the fact that any prohibition on a utility's consideration of liability derives from PUC guidelines and supervision. If utilities cannot consider liability as a factor in implementing PSPS events, it is because the PUC has determined that as a matter of policy utilities *ought not* consider liability in these decisions. The PUC has emphasized that utilities should instead consider only the public safety implications through a careful cost-benefit analysis. (Cal.P.U.C. Dec. No. 21-06-014, *supra*, 2021 Cal.P.U.C. Lexis 278 at p. *54.) By seeking damages resulting directly from PSPS events, Gantner's suit heightens the risk that potential tort liability will factor into a utility's shutoff decision-making. This puts Gantner's suit at cross-purposes with the PUC's carefully designed scheme. (*Gantner v. PG&E Corporation* (N.D.Cal. 2021) 629 B.R. 60, 67; see also *Southern California Gas Leak Cases* (2019) 7 Cal.5th 391, 401 ["exposure to liability often provides an important incentive for parties to internalize the social costs of their actions"].)

Furthermore, the PUC's supervision over PSPS extends far beyond regulating the implementation of power shutoffs. Recognizing "the growing threat of wildfire" (Cal.P.U.C. Dec. No. 19-05-042, *supra*, 2019 Cal.P.U.C. Lexis 270 at p. *3), the PUC determined that "proactively de-energizing power lines can save lives" (*id.* at p. *4). The PUC's carefully calibrated PSPS guidelines "build[] on new weather tracking and modeling technology" and add to "tougher regulations for removing

vegetation" (*ibid.*) while acknowledging that power shutoffs can cause real harm to affected individuals and businesses (*id.* at pp. *4–*5). By seeking liability for PSPS events regardless of whether the shutoff decision or implementation was negligent, Gantner's suit interferes with the PUC's broad supervisory power over how utilities can and should respond to the present threat of catastrophic wildfires. Gantner's suit also risks interfering with the PUC's careful ratemaking decisions, either by increasing utility costs directly through extensive litigation or by incentivizing the acceleration of grid maintenance and improvement beyond the levels accounted for by the PUC. (See *Hartwell*, *supra*, 27 Cal.4th at p. 276 [section 1759 bars action that could interfere with PUC ratemaking]; *Waters*, *supra*, 12 Cal.3d at p. 10 [same].)

Second, Gantner's suit would interfere with the PUC's post hoc review of PSPS events. The PUC has implemented its own process for evaluating the reasonableness of PSPS events and maintains the authority to issue penalties and orders to utilities based on noncompliance with existing PSPS guidelines. (See, e.g., Cal.P.U.C. Dec. No. 21-09-026, *supra*, 2021 Cal.P.U.C. Lexis 480 at p. *1 [finding that PG&E violated PUC guidelines in implementing fall 2019 PSPS events and assessing a penalty]; see also Cal.P.U.C. Dec. No. 21-06-014, *supra*, 2021 Cal.P.U.C. Lexis 278 at pp. *335–*351 [identifying numerous violations by PG&E related to the fall 2019 PSPS events].) The PUC's reasonableness review focuses on the environmental and grid conditions at the moment a utility decides to implement a PSPS event, as well as the utility's actions subsequent to that decision. (See Cal.P.U.C. Res. No. ESRB-8, *supra*, 2018 Cal.P.U.C. Lexis 330 at p. *9 [a utility "must reasonably believe that there is an imminent and significant risk that strong winds

will topple its power lines onto tinder dry vegetation or will cause major vegetation-related impacts on its facilities during periods of extreme fire hazard" in order to implement a PSPS event], underscoring omitted.)

Gantner's suit would require a court to hold a parallel review process, adding the judgment of a jury to that of the PUC in assessing the causes and propriety of PG&E's PSPS implementation. Gantner's inquiry focuses on PG&E's grid maintenance going back decades, even though PUC guidelines do not indicate that prior grid management or mismanagement is an appropriate factor for a utility to consider in implementing a PSPS event. Rather, the PUC's extensive guidance is focused on the conditions as they exist at the moment of implementation, based on a holistic assessment of weather conditions, ground conditions, and, inevitably, a utility's understanding of the strength and reliability of its grid infrastructure. (Cal.P.U.C. Dec. No. 12-04-024, *supra*, 2012 Cal.P.U.C. Lexis 165 at p. *40 [the utility "will be in the best position to determine when power should be shut off to protect public safety" because only the utility "has the detailed knowledge of its facilities that is needed to make this decision in real time based on contemporaneous local weather conditions"].) The PUC has made clear that a utility may decide to de-energize only when, in the moment, it believes the wildfire prevention benefits of such action outweigh the costs to residents and communities of de-energization. Assessment of a utility's compliance with these standards in deciding to implement a PSPS event "is a factual issue that is within the exclusive jurisdiction of the [PUC] to decide." (*Sarale v. Pacific Gas & Electric Co.* (2010) 189 Cal.App.4th 225, 243 (*Sarale*).)

Indeed, following the fall 2019 PSPS events at issue here, the PUC thoroughly reviewed PG&E's actions. The PUC found that PG&E violated its guidelines in numerous ways and assessed fines totaling $106 million, the majority of which resulted from inadequate notification to customers. (Cal.P.U.C. Dec. No. 21-09-026, *supra*, 2021 Cal.P.U.C. Lexis 480 at pp. *112–*114.) In a separate investigation, the PUC further determined that PG&E "failed to identify the possible safety risks resulting from an electric power shutoff" and "failed to evaluate these safety risks as part of the analysis of weighing the benefits and risks." (Cal.P.U.C. Dec. No. 21-06-014, *supra*, 2021 Cal.P.U.C. Lexis 278 at pp. *312–*313.) Although finding that "a monetary remedy [was] appropriate" for these violations (*id.* at p. *67), the PUC was "reluctant to impose monetary penalties," instead applying a ratemaking remedy (*id.* at p. *69). In choosing this remedy, the PUC intended to "strik[e] a balance between the need in 2019 for utilities to initiate PSPS events . . . against the equally compelling need to conduct PSPS events in a safe manner." (*Ibid.*)

Gantner's suit does not adopt any of the findings of fact or conclusions of law from either of these post-PSPS reviews. Rather, the complaint makes clear that Gantner seeks a parallel review process that if successful would require findings in tension with PUC guidelines. For example, while the complaint alleges underlying negligence in part because the wind gusts at the time of one PSPS event "[n]ever came close to the [PUC's] 92 miles per hour threshold," the PUC says it has "declined to use wind speed as a determinative factor for when a utility can or may not implement a PSPS event." Similarly, while the complaint alleges that PG&E failed to properly manage vegetation that "posed a foreseeable hazard to power lines," the

PUC considered and approved PG&E's proposed vegetation management as part of the utility's 2019 Wildfire Mitigation Plan (see *Decision on Pacific Gas and Electric Company's 2019 Wildfire Mitigation Plan Pursuant to Senate Bill 901* (May 30, 2019) Cal.P.U.C. Dec. No. 19-05-037 [2019 Cal.P.U.C. Lexis 272, *1, *29–*42]).

The current action thus seeks damages for the effects of PSPS events without any allegation that those events were executed in violation of PUC guidelines. Gantner's argument instead turns entirely on whether PG&E breached its duty of care and whether any breach caused the alleged damages. Because all alleged damages stem from the PSPS events themselves, the adjudication of breach, causation, and damages will inevitably involve an assessment of why the PSPS events were implemented and whether they could or should have been avoided. But the questions of PSPS implementation and execution — along with the policy choice to use PSPS to mitigate wildfire risk and protect public safety — are reserved to the PUC, which has exercised its authority to delineate the factors relevant to these inquiries. Section 1759 bars Gantner from seeking a parallel review of PG&E's PSPS decision-making and implementation through his suit. (See *Covalt, supra,* 13 Cal.4th at p. 939 [section 1759 bars an action seeking findings "inconsistent with the [PUC]'s conclusion"].)

## B.

Gantner argues that if this suit is barred, utilities like PG&E will "get a free pass for their own negligence." But "section 1759 does not leave plaintiffs without a remedy" for utility negligence. (*Sarale, supra,* 189 Cal.App.4th at p. 244.) It simply means that the "remedy lies before the commission

rather than in . . . court." (*Ibid.*) As the PUC notes in its amicus curiae brief, "The Legislature has . . . provided a statutory scheme that includes formal complaint procedures before the Commission." Customers concerned that PG&E may improperly implement PSPS could also "seek injunctive relief from the Commission" and could intervene in PSPS rulemaking. Moreover, the PUC notes that a utility's annual wildfire mitigation plan must "address all the actions a utility commits to take in the coming year to reduce wildfire risk — including system hardening, undergrounding lines, inspections, and vegetation management." (See § 8386, subd. (c)(3), (c)(8)–(10), (c)(12), (c)(14)–(15) [listing requirements of wildfire mitigation plans].) These plans are approved by OEIS and ratified by the PUC, and members of the public may comment on the proposed plans prior to approval. (§ 8386, subd. (d).) Similarly, the PUC's post hoc reasonableness review includes an assessment of why the utility implemented a PSPS event (Cal.P.U.C. Res. No. ESRB-8, *supra*, 2018 Cal.P.U.C. Lexis 330 at p. *8), and where a utility fails to provide a sound basis for PSPS implementation, the PUC can assess penalties and apply other remedial measures (Cal.P.U.C. Dec. No. 21-06-014, *supra*, 2021 Cal.P.U.C. Lexis 278 at pp. *67–*69 [assessing ratemaking remedy in lieu of penalties for PG&E's failure to consider the public risks of shutoffs before implementing its 2019 PSPS events]).

Gantner next argues that because the PUC cannot award damages to customers, this suit does not interfere with its authority over PSPS. Gantner is correct that the PUC does not and cannot award tort damages to customers affected by the negligence of utilities. (Cal.P.U.C. Dec. No. 21-06-014, *supra*, 2021 Cal.P.U.C. Lexis 278 at p. *68 [PUC "does not have

jurisdiction to award damages to utility customers"].) Gantner is also correct that our proposed holding might limit the ability of some customers harmed by PSPS events to seek compensation. But the possibility that some customers might not receive compensation for harms resulting from PSPS events is a result of the Legislature's decision to adopt section 1759, which limits actions that interfere with PUC supervision despite the PUC's inability to offer compensatory relief for utility negligence. Gantner's argument that no claim seeking damages based on past negligence could ever be barred by section 1759 is unsupported by our precedent. (See, e.g., *Waters*, *supra*, 12 Cal.3d at p. 10 [§ 1759 barred claim seeking damages for telephone utility's past negligence]; *Covalt*, *supra*, 13 Cal.4th at p. 950 [damages based on negligence of electric utility "would plainly undermine" the PUC's policies]; *Hartwell*, *supra*, 27 Cal.4th at p. 276 [§ 1759 barred claim for damages based on utilities' past provision of allegedly unhealthy drinking water].) To the extent that customers are left without recourse to seek compensation for the alleged negligence of utilities or the loss of power during PSPS events, such concerns are properly directed to the Legislature.

Because his suit is based on allegations of negligent grid management prohibited by PUC regulations, Gantner contends that this action supports rather than hinders PUC authority. But even if the current action might support the PUC's supervisory role over grid maintenance, the authority it interferes with relates to the PUC's supervision of PSPS. Gantner is correct that imposing liability can alter a defendant's behavior, and if this suit were allowed to proceed, Gantner may be right that it would "incentivize[] PG&E to provide safe and reliable electricity to its customers." But Gantner did not file

suit based on harm resulting directly from underlying negligence in grid maintenance, and he did not seek an administrative remedy through the PUC to compel PG&E's compliance with maintenance regulations. Rather, Gantner filed suit for alleged harms that resulted directly and exclusively from PSPS events. As noted, because the action heightens the risk that a utility's PSPS decision-making may be influenced by considerations outside the scope of the cost-benefit analysis set forth by the PUC, it works at cross-purposes with the PUC's regulation, supervision, and guidelines, and thus section 1759 bars this suit.

As noted, today's decision does not foreclose the possibility of a narrowly tailored suit based on allegations that a utility acted negligently and in violation of PUC guidelines in its decision to implement PSPS events or the implementation of those events. We also decline to address whether a negligent grid maintenance suit could proceed on a narrow claim for damages or injunctive relief that is properly tailored to avoid conflict with any Commission regulations over PSPS and wildfire safety. Because Gantner's complaint does not raise such claims, we need not decide whether they would be barred by section 1759.

Gantner also argues that regardless of the PUC's regulation of PSPS at the time of the fall 2019 PSPS events, subsequent legislation transferring PSPS supervisory authority to OEIS means the PUC no longer possesses any authority with which his suit could interfere. It is true that OEIS now has "all functions" of the PUC's former Wildfire Safety Division. (§ 326, subd. (b).) But PG&E notes that the statutory transfer of authority to OEIS occurred "well *after* the filing of this lawsuit and the 2019 PSPS events." The parties thus appear to disagree

on whether section 1759 preemption can occur where a supervisory program *was* "broad and continuing" or whether it requires a program that *is* "broad and continuing."

We need not resolve this disagreement because in any event, the PUC retains a supervisory and regulatory role over PSPS such that section 1759 bars the current action. The statute transferring authority to OEIS noted that "[n]othing in this chapter affects the commission's authority or jurisdiction over an electrical corporation, electrical cooperative, or local publicly owned electric utility." (§ 8385, subd. (b).) And the PUC has continued to exercise control over various aspects of PSPS regulation and supervision. The PUC ratifies wildfire safety plans approved by OEIS (§ 8386.3, subd. (a)), conducts investigations and levies penalties following PSPS events (see, e.g., Cal.P.U.C. Dec. No. 21-09-026, *supra*, 2021 Cal.P.U.C. Lexis 480 at pp. *115–*116), and continues to enforce its existing PSPS guidelines and resolutions (*id.* at pp. *109–*110). The statute vesting supervisory powers over PSPS in OEIS repeatedly refers to the ongoing legal obligation of utilities to comply with PUC orders, rules, and requirements. (See, e.g., § 8386, subd. (c)(11) [utilities' de-energization protocols "shall comply with any order of the commission regarding deenergization events"]; see also *id.*, subd. (c)(7) [mandating compliance with "orders of the commission regarding notifications of deenergization events"]; *id.*, subd. (c)(12), (c)(15), (c)(16), (c)(18), (c)(19)(B), (c)(21), (c)(22)(C) [all referencing PUC rules, regulations, or decisions in establishing utilities' ongoing obligations].) Moreover, section 1759 preemption can occur where the PUC shares supervisory or regulatory authority with another agency. (See *Hartwell*, *supra*, 27 Cal.4th at p. 274 [PUC "continue[d] to exercise its jurisdiction to regulate drinking

water quality" despite relying on contamination standards set by the Department of Health Services].)

Finally, we note that the PUC has submitted an amicus brief asserting that allowing Gantner's suit would "interfere with the Commission's broad, general, and ongoing administration of PSPS policies." We have previously given weight to the PUC's views regarding section 1759 preemption. (See *People ex rel. Orloff v. Pacific Bell* (2003) 31 Cal.4th 1132, 1153 ["Indeed, the PUC itself, in an amicus curiae brief filed in this court in support of the People, agrees that nothing in the present action undermines or hinders any ongoing policy, program, or other aspect of its authority."].) At the same time, " 'the PUC's interpretation is not controlling but . . . is one of "among several tools available to the court." ' " (*Wilson v. Southern California Edison Co.* (2015) 234 Cal.App.4th 123, 147, fn. 23; see also *id.* at pp. 147–151 [declining to adopt the PUC's view that § 1759 barred the action].) We have no need here to consider as a general matter how much weight is properly accorded to the PUC's view. We simply note that the PUC's position, which is supported by the facts and our section 1759 precedent, further bolsters our holding.

## CONCLUSION

We hold that section 1759 bars Gantner's action against PG&E because the suit would interfere with the PUC's broad and continuing supervision and regulation of PSPS implementation and review. We express no view on whether Tariff Rule 14 would also prohibit Gantner's suit.

**LIU, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**GROBAN, J.**
**JENKINS, J.**
**EVANS, J.**
**O'ROURKE, J.***

---

* Associate Justice of the Court of Appeal, Fourth Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Gantner v. PG&E Corporation

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**  XX on request by 9th Circuit (Cal. Rules of Court, rule 8.548)
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S273340
**Date Filed:**  November 20, 2023

_____

**Court:**
**County:**
**Judge:**

_____

**Counsel:**

Phillips, Erlewine, Given & Carlin, Nicholas A. Carlin, Brian S. Conlon, Kyle P. O'Malley; Hausfeld, Bonny E. Sweeney, Seth R. Gassman and Tae H. Kim for Plaintiff and Appellant.

Glancy Prongay & Murray and Jonathan M. Rotter for Former President of the Public Utilities Commission Loretta Lynch, Former Administrative Law Judge Steven Weissman and Professor Seth Davis as Amici Curiae on behalf of Plaintiff and Appellant.

Cravath, Swaine & Moore, Omid H. Nasab; Horvitz & Levy, Robert H. Wright and Jeremy B. Rosen for Defendants and Respondents.

Munger, Tolles & Olson, J. Kain Day and Henry Weissmann for Southern California Edison and San Diego Gas & Electric as Amici Curiae on behalf of Defendants and Respondents.

Vinson & Elkins, Mortimer H. Hartwell, Jeremy C. Marwell, Matthew X. Etchemendy and Nathan T. Campbell for Edison Electric Institute as Amicus Curiae on behalf of Defendants and Respondents.

Christine Jun Hammond, Candace J. Morey and Mary McKenzie for the California Public Utilities Commission as Amicus Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Nicholas A. Carlin
Phillips, Erlewine, Given & Carlin LLP
39 Mesa Street, Suite 201
San Francisco, CA 94129
(415) 398-0900

Omid H. Nasab
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 8th Avenue
New York, NY 10019
(212) 474-1972

Candace J. Morey
California Public Utilities Commission
505 Van Ness Avenue
San Francisco, CA 94102
(415) 703-3211